**Hazell M. SMITH, Plaintiff,**

v.

**Otis H. SMITH, by David H. CLARKE, his authorized agent and attorney-in-fact, Defendant.**

**C.A. No. 1883.**

Court of Chancery of Delaware, Sussex County.

Submitted: Oct. 8, 1998.

Decided: March 11, 1999.

Eugene H. Bayard and Veronica O. Faust of Wilson, Halbrook & Bayard, Georgetown, for Plaintiff.

Robert K. Payson and Peter L. Tracey of Wilmington; Frank J. Peragine of Simon, Peragine, Smith & Redfearn of New Orleans, Louisiana, of counsel, for Defendant.

## OPINION

STEELE, Vice Chancellor.

Plaintiff Hazell M. Smith filed a complaint for a declaratory judgment[1] asking this Court to void language in a deed signed between her and her former husband, Defendant Otis H. Smith. The language she disputes restricts Hazell's ability to transfer the land. It grants Otis a right of first refusal at an inflation-adjusted fixed price to purchase the land (the "option"). The deed purports to grant the option to Otis and his immediately related heirs or assignees (the "optionees") against Hazell and her heirs and devisees (the "optionors"). The facts are undisputed and the parties filed cross-motions for summary judgment.

I must decide two issues:

(1) whether, under the deed's savings clause, I can select a life in being to measure the duration of the option in order to avoid a conflict with the rule against perpetuities; and

(2) whether the special circumstances of Hazell and Otis' division of marital property as a consequence of divorce and Otis' desire to protect his family's interest in the land merit an exception to the rule against fixed-price preemptive rights for this temporally restricted inflation-adjusted fixed-price option.

The parties agree that both the class of optionors and the class of optionees con-

---

1. Although she styles her complaint in the form of a request for a declaratory judgment, it is in fact a subtle, if not clever, attempt to reform a deed.

tained unascertainable, possibly unborn members at the time Hazell and Otis executed the deed. The deed thus violates the rule against perpetuities. They do not agree that the deed's savings clause allows the disputed language to be construed in accord with the rule. The deed fails to specify a life in being at the time of the deed's execution that must act as a measuring stick for the option's duration. The savings clause, however, allows me to ascertain the parties' intent in choosing the awkward language selected and construe the option to comply with the rule against perpetuities. I conclude that the signatories, Hazell and Otis, are the relevant lives in being at the time that the option was created and their lives must be used as the gauge for measuring the option's duration.

Hazell challenges the option on public policy grounds as well, arguing that it establishes fixed-price preemptive rights—a contingent interest not favored in this State. Otis, however, convincingly argues that the option's duration (as fixed by this court) and inflation-adjusted price are reasonable under these special circumstances. I am convinced that the special circumstances—a divorced spouse's desire to assure his family the opportunity to hold onto land if the other spouse decides to sell it, and a deed purporting to act as a negotiated property division settlement ancillary to a divorce—justify upholding an inflation-adjusted fixed-price right of first refusal that constitutes part of a much broader property settlement agreement.

Because I find that the disputed language is susceptible to a clear construction in accord with the rule against perpetuities and constitutes a reasonable restraint under the circumstances, I grant summary judgment in favor of Otis.

## I.  BACKGROUND

Hazell lives in Lewes, Delaware. She divorced Otis in 1995. As part of the settlement, they executed a property division agreement (the "deed") whereby he conveyed 229 acres of farmland outside Lewes to her.[2] The deed grants Hazell a fee simple interest in the land subject to Otis' right of first refusal at an inflation-adjusted fixed price of $1.42 million.[3] The deed, acting as an ersatz marital property division agreement, extinguishes all other claims between Hazell and Otis.

This dispute arises over Otis' option to buy the 229 acres. The deed purports to bind not only Hazell, but her estate, heirs, and devisees as well. The relevant language reads:

> RESERVING, HOWEVER, unto the said party of the first part, through his attorneys-in-fact, guardians, executors and administrators, and unto his heirs and assigns, but only to the extent such heirs and assigns constitute the part of the first part's immediate relatives, (expressly including David H. Clarke and his heirs) (the "Optionees"), in the event the party of the second part, *or her estate ("estate" to include her heirs or devisees)* (the "Optionors"), should decide to sell or gift the herein-described real property, or any portion thereof, to any person or entity other than the party of the first part's or the party of the second part's immediate relatives (expressly including nieces and nephews), an option to purchase such property for a purchase price of $1,420,000.00 .... [4]

The deed also provides that fractional transfers shall be offered to Otis first at a price reflecting the fractional option price thereof. *Id.* at 11. It also expressly grants to Hazell, Otis' "right, title, and interest" "absolutely and in fee." *Id.*

---

2. Deed of Feb. 8, 1995, signed by Hazell Smith and Otis H. Smith's attorney-in-fact, David H. Clarke, Sussex County Recorder of Deeds, Deed Book 2032, Page 347 [*Smith Deed*].

3. The deed adjusts the purchase price for inflation, "the added value produced by application of the sum of the annual Consumer Price Index (CPI) figures." *Smith Deed* at 10.

4. *Smith Deed* at 10.

Hazell argues that the italicized language violates the rule against perpetuities. The rule is a peremptory command of law that prevents parties from restricting the alienability of land for more than 21 years after the life of a being in existence at the time the restriction was created.[5] Inherited from 17th century English common law, the rule against perpetuities is designed to prevent the dead from dominating the affairs of the living through cumbersome restrictions on the use of that society's primary source of wealth, land, and to protect the right of the living to enjoy and develop that resource.[6] The Court must void any language creating an interest where there is a possibility that the created interest will vest after the time period proscribed by the rule.

The parties agree that the italicized language grants a right of refusal to Otis and his immediate relatives that possibly vests upon the attempt of Hazel's yet-unborn heir or devisee to sell the land.[7] The deed purports to bind these unborn optionors even after all optionors and optionees alive at the time the deed was executed had died.[8] That possibility flatly violates the rule against perpetuities and, barring successful application of a savings clause, compels nullification of the offensive provision, voiding it *ab initio*.[9]

The deed, however, contains a savings clause that Otis argues precludes Hazell's sought-after nullification of his option. The savings clause reads:

In the event that any of the reservations or restrictions contained herein should result in a violation of the rule against perpetuities if enforced, then such reservation or restriction shall be deemed and construed only to extend and apply to those persons or classes who may be lawfully restricted in the selling or gifting of all or a portion of the herein-described real property without violating the aforesaid rule.[10]

5. *Stuart Kingston, Inc. v. Robinson,* Del.Supr., 596 A.2d 1378, 1383 (1991).

6. *Pathmark Stores, Inc. v. 3821 Assoc., L.P.,* Del. Ch., 663 A.2d 1189, 1191 (1995); 17 C.J.S. *Perpetuities* § 14 (West Pub.1987). The rule was first articulated in the *Duke of Norfolk's case* by the Lord Chancellor Heneage Finch, formally known as Lord Nottingham. He held (1) that the validity or invalidity of a future interest depended on its remoteness, and not on the nature of the contingency and (2) that a future interest might be limited to commence on any contingency which must occur within lives in being. (The 21–year period after the death of the being alive at the time of the future interest was added to account for interests vesting in minors in existence at the expiration of the life.) 70 C.J.S. *Perpetuities* § 14.

The *Duke of Norfolk's case* arose when the Duke's father, the Earl of Norfolk, set up a trust to hold his estate on behalf of his eldest and insane son, Thomas. Thomas died without issue and his younger brother, Henry, became the Duke of Norfolk (the earldom having been restored to a dukedom in 1662). Henry moved to secure his holdings by suffering a common recovery to extinguish his younger brother's contingent interest in the trust's land. Charles sought equitable relief in Chancery. Lord Nottingham ruled in favor of Charles, holding that temporally qualified future contingent interests played a useful role as determined by "the Necessity of Things and the Nature of Commerce." 3 Ch. Cas. 1, 31, 22 Eng. Rep. 931, 950 (1681). Professor Charles J. Reid, Jr. remarks that Lord Nottingham crafted an astute accommodation of two clashing societal forces, the gentry's desire to protect their vast estates and a burgeoning need for free alienability of land in a time of political and industrial revolution. This paragraph borrows from passages in his work, *The Seventeenth–Century Revolution in the English Land Law,* 43 Clev. St. L. Rev. 221, 268–72 (1995).

7. "[T]he validity of a limitation is ... to be determined under the circumstances then existing, and the certainty that it will vest within the permitted period, if at all, must be discernible at that date." 70 C.J.S. *Perpetuities* § 16.

8. The deed also grants the option to Otis' immediately related heirs and assignees without temporal limitation. This offensive aspect of the optionee class as well is remedied by the holdings of this Opinion.

9. *Pathmark Stores,* Del.Ch., 663 A.2d at 1191–92.

10. *Smith Deed* at 11.

The parties added the clause after their counsel exchanged correspondence regarding the option's possible violation of the rule against perpetuities. In light of the undisputed facts, I must determine whether this savings clause operates to save the otherwise void option.

What is unusual about this dispute is that it arises not because of unforeseen circumstances, but because one side challenges a disadvantageous term's application to exactly the circumstances foreseen by the parties. The claim is colorable, however, because one provision, in isolation, violates the rule against perpetuities. This Court must decide whether the savings clause can perform its intended function, to make an otherwise unenforceable restriction enforceable. When parties to a legal document clearly express their intent in the document, a court should effectuate that intent when it can be done without violence to public policy. I do so, with admittedly less well-crafted deftness than Lord Nottingham, by interpreting the deed's option language consistently with both the law and the parties' intentions.

I also address Hazell's unreasonable restraint argument. Hazell argues that if this Court finds that the option does not violate the rule, then I must still nullify the option as an unreasonable restraint on alienation of land. She cites *McInerney v. Slights* for the proposition that a fixed price right of first refusal held for the holder's life is unreasonable under the balancing test set forth in RESTATEMENT PROPERTY § 406.[11] The *McInerney* Court held that a preemptive right at a fixed price constitutes an unreasonable restraint on alienation unless it is reasonable under the circumstances.[12] Unlike an ordinary right of first refusal (which merely substitutes the identity of the buyer), a fixed-price right of first refusal, when lower than the market price, discourages the efficient redistribution of land. The fixed-price right impedes the land's purchase by the person who values it most highly (and is therefore, at least theoretically, willing to pay the most for it). This happens because the landholder cannot sell at market price and cannot reap the economic benefit derived from selling to the highest bidder. Consequently, the landholder holds onto land that would otherwise be transferred to someone who places a higher value on it.[13] Hazell claims that this policy demands that the Court nullify the option.

Otis points out that in *Maddock v. Greenville Retirement Community, L.P.*, Chancellor Allen held that special circumstances permitted a fixed price right of refusal, and claims that similar circumstances exist here.[14] In *Maddock*, Chancellor Allen upheld the right of the retirement center to buy back retirees' homes at a discount from the sale price. Thus, the retiree always took a loss, possibly a large loss if real estate prices had risen in the interim. Nonetheless, Chancellor Allen noted that fees and penalties charged by other retirement homes that used an entrance fee and lease financing structure were similar to those charged by the center, and that the center's system conferred tax advantages upon both the center and

---

11. Del.Ch., C.A. No. 1096-S, mem. op. at 15, Allen, C., 1988 WL 34528 (Apr. 13, 1988).

12. *Id.* at 15-18.

13. *Id.* at 18-19 (holding "this type of agreement [fixed-price right of first refusal], at least in this type of market, threatens to act as a complete impediment to the free alienability of land that our law has for centuries sought to encourage."). Another way of looking at it is to say that the rule subjects the landholder to the relentless economic pressure to realize maximum value for the land by imposing an opportunity cost for not selling. The fixed-price right of first refusal insulates the landholder from that opportunity cost by capping the value of that opportunity. *Id.* at 15-16, n. 4 (noting the "social interest in keeping land available for transfer, so that development, which is thought to have social benefits, may be promoted").

14. Del.Ch., C.A. No. 12564, mem. op. at 18, Allen, C., 1997 WL 89094 (Feb. 26, 1997).

retiree.[15] He concluded that the center's preemptive right was an integral part of the center's living space and elder care service scheme and held that this integrated scheme legitimized the restraint.[16] Otis believes that the divorce settlement's purposes are similarly reasonable and that the parties knew and understood the role the option played in the overall settlement scheme when they agreed to its language.

## II.  RULE AGAINST PERPETUITIES

■ I start with the proposition that a grant of a future interest that might result in a vesting after the period allowed by the rule is void *ab initio*. Without the savings clause, the option is void. The savings clause, however, clearly contemplates that possibility and provides for the option to be interpreted to comply with the rule. Common law has established the principle that where language creating a future interest is susceptible to two interpretations, one in compliance and one in violation of the rule against perpetuities, the former shall be chosen.[17] That principle comports with this State's longheld policy of honoring contract parties' express intent by accepting the clear meaning of the parties' chosen language without judicial modification.[18] Consequently, if I can interpret language in the savings clause in a manner which allows the option to comply with the rule, I must. To do otherwise would be to ignore the parties' expressed intent to preserve the option.

■ I begin with the problem that the option language purports to bind optionors and favor optionees for an indeterminate time. To allow Otis' yet-unborn heirs or assigns to exercise the option or to restrict Hazell's yet-unborn heirs and devisees ability to transfer the land perpetually would continue the divorced couple's acrimony, place an unreasonable burden on the market and violate the principle of the rule. The savings clause purports to allow a court to reconcile the offensive language with the rule against perpetuities by restricting the class of optionors. It commands that any "[unlawful] restriction shall be deemed and construed only to extend and apply to those persons or classes who may be lawfully restricted." [19]

■ The savings clause's curative mechanism thus operates to circumscribe the optionor class in order to bring the option into compliance with the rule. Before exploring how that might be done here, it is necessary to define the flaw contained in the option. The deed defines the optionors to include "the party of the second part [Hazell], or her estate ("estate" to include her heirs or devisees)." The fact that Hazell's estate has not come into being or that her heirs and devisees have not come into existence is not itself the issue. So long as the restriction expires within 21 years after the death of a life in being, Hazell may restrict her heirs' and devisees' ability to transfer the land. Moreover, any uncertainty as to whom the optionees were at the time Hazell and Otis executed the deed is of no moment. The rule allows unborn or contingent classes of persons to take a future contingent interest in property *so long as* the interest must vest within 21 years of the death of a life in being at the time the interest was

15.  *Id.* at 21–22.

16.  *Id.* at 23.

17.  *McInerney v. Slights*, Del.Ch., C.A. No. 1096–S, mem. op. at 12, Allen, C., 1988 WL 34528 (Apr. 13, 1988) ("If the construction of a grant or of a contract is doubtful, and one construction of the language would result in an interest that would not offend the Rule, that construction should be adopted.").

18.  *E.g., Ince & Co. v. Silgan Corp.*, Del.Ch., C.A. No. 10941, mem. op. at 3, Chandler, V.C., 1994 WL 728799 (Dec. 8, 1994).

19.  I interpret the use of the pejorative word "restricted" to refer only to optionors, the "persons or classes" encumbered by the option.

created.[20] The language here violates the rule because the parties to the deed selected no life in being against which to measure the duration of the option. Thus, the question boils down to whether the savings clause allows the class of optionors to be circumscribed in a way that resolves who the life in being was at the time the parties executed the deed.[21]

The savings clause reads:

In the event that any of the reservations or restrictions contained herein should result in a violation of the rule against perpetuities if enforced, then such *reservation or restriction shall be deemed and construed* only to extend and apply to those persons or classes who may be lawfully restricted .... [22]

The savings clause does not singularly command that I shrink the pool of optionors named in the agreement, but flexibly provides that I *construe* the option however necessary to comply with the rule against perpetuities. It allows the Court to *restrict* the class of optionors *temporally* to bring the offensive reservation into compliance with the rule. The only way I can temporally restrict the interest of the optionors is to select a life in being. To do so, I must ask the question, "who was the parties' intended life in being?" The answer must lie in the deed.

Thus, the inquiry moves to the issue of whether the option can be construed in any meaningful way that permits selection of a life in being.[23] The following principles govern this analysis. First, if the parties' intended life in being can be discerned from the document, even if not expressly named as such, their intent should be honored.[24] Second, the number of selected lives in being is unlimited, but each life must be a living person and reasonably ascertainable at the time the interest is created.[25]

In drafting the option, the parties agreed upon an optionor class including "[Hazell] the party of the second part, or her estate ("estate" to include her heirs or devisees)." Clearly the parties contemplated that this deed would bind Hazell and her estate. Indeed, she signed the deed as part of her divorce settlement with Otis, personally acknowledging her willingness to be bound by the option. I deem Hazell to be a life in being against which the option's duration must be measured.

Hazell's estate, however, did not exist.[26] Neither did her heirs nor devisees. A

**20.** 70 C.J.S. *Perpetuities* § 16(c) ("The rule does not demand that the particular individuals in whom a future estate is to vest shall be ascertainable at the creation of the estate, and it is satisfied if it be certain that they will be definitely ascertainable within the period by it specified."). Note that this ruling assures that the identity of all optionors and optionees shall be ascertained before expiration of the option, because all of Hazell's heirs and devisees and Otis' heirs and assignees shall be known within 21 years of the death of the latter of Hazell and Otis.

**21.** 70 C.J.S. *Perpetuities* § 18(a) ("Courts will consider the lives of the designated persons as those intended to be selected, and will uphold the interest or estate for the period of twenty-one years after the death of the survivor of such persons.").

**22.** *Smith Deed* at 11.

**23.** In *Fitchie v. Brown*, the U.S. Supreme Court construed a savings clause that set a trust's duration "for as long a period as is legally possible" as allowing the trial judge to select the lives of the designated beneficiaries (who were alive at the time the trust was created by will) as the trust's lives in beings. 211 U.S. 321, 330, 29 S.Ct. 106, 53 L.Ed. 202 (1908); *see also* 70 C.J.S. *Perpetuities* § 18(a).

**24.** *See* 70 C.J.S. *Perpetuities* § 18(b) (stating "[w]hile the persons on whose lives an estate is limited must be *selected* by the *instrument* creating or granting it, they need not be specifically named, provided they can be ascertained").

**25.** 70 C.J.S. *Perpetuities* § 18(b) ("[T]here is no limitation on the number of lives in being on which an estate may be limited or its vesting postponed without violating the rule against perpetuities as long as 'the candles are all burning at the same time.'") (citations omitted).

**26.** I need not address the problematic issue of whether an estate, an inanimate legal entity, can serve as the life in being.

condition precedent to each class' creation, Hazell's demise, had not come to pass. Therefore, any potential class member cannot serve as the life in being for two reasons. First, some might not have been born at the time Hazell executed the deed, and, therefore, by definition, cannot be a life in being. Secondly, even if Hazell's devisees (or heirs) were living at the time the parties executed the deed, they were not readily ascertainable. The identities of Hazell's devisees (or heirs) are unavoidably unascertainable until Hazell, lamentably, fulfills the necessary condition precedent. Therefore, no member of these two groups can serve as a temporal measuring stick.

There is no requirement that the life in being be the optionor as opposed to the optionee or a third party.[27] My analysis next turns to those optionees or third parties who might serve as a life in being. The deed grants the option "unto [Otis] the said party of the first part, through his attorneys-in-fact, guardians, executors and administrators, and unto his heirs and assigns, but only to the extent those heirs and assigns constitute the party of the first part's immediate relatives, (expressly including David H. Clarke and his heirs)." Otis' attorneys-in-fact, guardians, executors and administrators are named as mere ministerial players, with no interest in the option. There is nothing in the language of the deed that suggests that these non-interested players or any other non-optionor/non-optionee should be a life in being against which the duration of the option is measured.

That leaves Otis and his "heirs and assigns, but only to the extent such heirs and assigns constitute the part of the first part's immediate relatives, (expressly including David H. Clarke and his heirs)." Without doubt, Otis intended the option to vest at any point in his life and afterwards. I am sure from Otis' tactical position in this matter that he would readily volunteer himself as a life in being, but more importantly, the deed clearly contemplates Otis' right and his immediate relatives' right to exercise the option while Otis is alive and for some time thereafter. Otis qualifies as a life in being.

As Hazell's, Otis' heirs and assigns, were not "in being" at the time that Otis and Hazell executed the agreement either. Therefore, their identity could not be readily ascertainable nor were they necessarily lives "in being" at the time. Consequently, the heirs and assigns cannot serve as lives in being for the reasons already given above.[28]

Simply by concluding that the heirs and devisees of Hazell and Otis cannot serve as lives in beings to measure the duration of the option does not foreclose their respective obligation to honor or right to exercise the option. Once a valid life or lives in being have been selected to limit the duration of the option, it may still vest in favor of Otis' immediately related heirs and assignees. Hazell, as well, may not transfer the land without triggering or passing along the option during its life.[29] The option shall expire 21 years after the death of the later of Hazell and Otis.

## III. UNREASONABLE RESTRAINT

Delaware has adopted the Restatement's balancing test to determine the reason-

27. *See* 70 C.J.S. *Perpetuities* § 18(b) ("The selected lives need not be those of persons having an interest in the property, although they may be such.").

28. I note that David H. Clarke is expressly mentioned, but he is part of a restrictive "immediate family" condition placed upon the yet-to-be determined classes of heirs and assigns. David H. Clarke takes an interest only if he becomes a heir or assignee of Otis, but

he was neither at the time of the agreement. The deed conditionally involves him; therefore, I cannot conclude the parties intended to measure the option's duration against his life.

29. This Opinion does not attempt to resolve any ambiguities that may exist in any of these terms.

ableness of a preemptive right for a fixed price:

(1) The one imposing the restraint has some interest in land which he is seeking to protect by the enforcement of the restraint;

(2) the restraint is limited in duration;

(3) the enforcement of the restraint accomplishes a worthwhile purpose;

(4) the type of conveyance prohibited are ones not likely to be employed to any substantial degree by the one restrained;

(5) the number of persons to whom alienation is prohibited is small; and

(6) the one upon whom the restraint is imposed is a charity.[30]

The Restatement's balancing test maximizes a judge's flexibility in shaping a fair outcome based on each particular set of facts. But despite this flexibility, the test provides little help nor does it add predictability.[31] This test's elements provide a poor framework to analyze what I consider to be the dispositive issues in this matter. Instead, I apply the legal principles found in earlier Delaware cases directly to the matter at hand, without trying to pigeon hole the issues into the cumbersome framework contrived by the authors of the RESTATEMENT.

▮ The legal question is whether the option is an unreasonable restraint on the alienation of land. There are two main elements: the option's duration and the fairness of the strike price. There exists a presumption that a right of first refusal at a fixed price is unreasonable and against public policy because it discourages the free transfer of land. To overcome the presumption, Otis must show that the option's duration and price are reasonable, articulating any special circumstances that might influence what the Court deems reasonable.

### 1. Duration

▮ I find the fact that the savings clause allows the option to comply with the rule against perpetuities to be an indication that its duration is reasonable. One of the special circumstances present in this case is the fact that Hazell and Otis bargained for the option as part of a property settlement arising from their divorce. Otis and Hazell's divorce split their family and forced them to divide land which the couple once jointly controlled and enjoyed. An inspection of the entire option language reveals that Hazell cannot encumber the land with long-term leases and must be compensated if it is purchased under the option, for any capital improvements to it.[32] Hazell's interest is similar in some, but not all ways to a life estate.[33] It

---

30. *McInerney v. Slights*, Del. Ch., C.A. No. 1096–S, mem. op. at 17–18, Allen, C. (Feb. 25, 1988); *but see Maddock v. Greenville Retirement Community, L.P.*, Del.Ch., C.A. No. 12564, mem. op. at 20, Allen, C., 1997 WL 89094 (Feb. 26, 1997) (affirming principles articulated in RESTATEMENT PROPERTY § 406, but not listing test's elements and noting that only some of the elements were relevant to the dispute).

31. Although the RESTATEMENT's test preserves my flexibility in adjudicating this matter, flexibility already exists without a test and is not itself a reason for adopting one. I consider the only advantage in adopting a test to be that it provides a comprehensive, logical, and predictable format for analyzing an issue.

32. "Optionors shall not unreasonably negatively restrict the use or impact the value or

marketability of the hereindescribed real property by the imposition of lease agreements whose terms shall be longer than five (5) year terms." *Smith Deed* at 10. The agreement also provides compensation to the optionees for "the fair market value of any capital improvements placed thereon." *Id.*

33. I note sister state precedent for the notion that neither the rule against perpetuities nor policy against fixed-price preemptive rights would have applied if Otis retained a reversionary interest in the land. In *Dennis v. Bird*, the Kentucky Court of Appeals granted specific performance to grantor who retained an option to repurchase land for $400 if the purchaser vacated the premises. The court held that the rule against perpetuities did not apply because purchaser's interest in the property was encumbered by grantor's right

materially differs in that Otis did not retain a reversionary interest, but bargained for the contingent right to buy if Hazell sells her fee simple interest in the land to someone outside the family. The structure of the option's terms evinces a clear intent to prevent Hazell from unilaterally selling the land to someone outside the family, but otherwise allows her to enjoy its use.

I note that Lord Nottingham's decision in the *Duke of Norfolk's case* struck a balance between the desire of gentry to protect their land holdings and the right of citizens to buy and develop land. He did not entirely reject the proposition that landholders could control the disposition of their land after death. He limited that right temporally, however, to balance it with the need for the living to acquire land clear and free.

In line with that reasoning, it does not seem unfair to me that the spouse losing ownership of marital property should want to protect the right of his or her family to enjoy the benefits of the property as the law generally contemplates.[34] The option appears reasonably designed to protect Otis' desire to assure his immediate family the opportunity to continue to own and enjoy the Lewes farmland, if Hazell were to attempt to transfer it to an outsider. As discussed below in relation to price, the deed in question does much more than simply transfer ownership of real property. It purports to be an arm's length, bargained for contract dividing marital property expressing a clear intent to extinguish all other claims arising out of an

Alabama divorce. Both parties' desire to place a time limit on the option appears to be a rational exercise of a judgment about the option's value within the overall marital property division scheme and is not unreasonable in these circumstances.

### 2. Option price

The law subjects a fixed-price right of first refusal to intense scrutiny because it prevents the landholder from seizing an opportunity to sell land at the highest price available. The longer the right exists, the greater the risk that the market price will far exceed the price the option holder must pay—a factor favoring nullifying the option. Otis' option, Hazell believes, denies her the opportunity to sell the land for the best price possible for an unreasonably long period and that it should be voided as against public policy.

Although legitimizing the option prevents Hazell from maximizing the value of transactions with third parties, I find it more likely the parties' chosen language focused on their temporally restricted interest to assure that the land passed on to family members. It is also likely the option results from the property division bargaining process and had a value essential to the overall consideration exchanged in that process. The fact that the option's price is adjusted for inflation ameliorates the possibility that the optionees' strike price will be unfair. Indeed, the price of $1.42 million does not strike me to be a mere bagatelle. Moreover, if inflation, as measured by the deed's benchmark, the

of entry and that the right vested at the time of transfer. The *Dennis* Court further held that purchaser could not oppose the grantor's right to reenter for $400 on public policy grounds because the $400 was not in exchange for a fee simple interest, but for the purchaser's interest restricted by grantor's vested right. *Dennis v. Bird,* Ky. Ct.App., 941 S.W.2d 486, 488–90 (1997).

Because this deed's structure and purpose are similar to those of a life estate with the grantor retaining a reversion, the fact that neither the rule against perpetuities nor

against unreasonable restrictions would apply to a reversionary right of reentry reinforces my conclusion that these analogous circumstances merit an exception to the latter policy as well.

34. *See Succession of Reeves,* La.App.Ct., 704 So.2d 252, 259 (1997) ("The two closest relationships that exist between persons are the relationship of parent to child and that of husband and wife. Either a spouse or a child is clearly a 'natural object of a testator's bounty.' ").

Philadelphia region's consumer price index, outpaces the rise in value of the land, Otis' option cost may exceed the market price of the land. Certainly no one who lived through the 1970's would automatically conclude that the option's cost is one-sidedly advantageous.

If the couple had not divorced, Otis would have been able to enjoy the land himself and leave it to his immediate family. Under the circumstances, his option was a reasonable means of keeping the land in the family for the life of the option. Otis' strike cost affords Hazell the opportunity to realize a decent return on the sale of her land while protecting her former husband and his immediate family's desire to maintain control of property that he once owned. This property settlement required division of a family asset, but the divorced couple bargained to keep certain lands within the family despite the market's conceivable insatiable demand for property. Under these circumstances, the option is a reasonable means of protecting a family's interest in the disposition of their land and reflects a freely bargained for, court approved, exchange of consideration contained in a property division agreement ancillary to a divorce.

## IV. CONCLUSION

The agreement's underlying purpose, to transfer the land to Hazell, while reserving Otis the inflation-adjusted fixed-price right of first refusal, came about as part of a property settlement arising out of the parties' divorce. Clearly, the parties envisioned that Hazell would enjoy use of the land, but with the restriction that she could not sell it to an unrelated third party without triggering Otis' option to buy. The parties wanted to keep the land in the family, a reasonable purpose for granting the option, but they tried to encumber the optionor's ability to transfer the land for an indefinite period. The indefinite nature of the option violated the rule against perpetuities and invoked the deed's savings clause.

Hazell and Otis bargained for a reasonable restriction upon Hazell's ability to transfer the land. To protect that bargain, they expressly agreed that a reviewing court must preserve their intent by saving offensive language from violating the rule against perpetuities where possible. I honor their bargain, finding that the deed contemplated two people, Hazell and Otis, to serve as lives in being. The option shall expire 21 years after the death of the later of the two.

Hazell and Otis agreed to Otis' option as part of a property division settlement ancillary to a divorce. Under those circumstances, it was reasonable for them to assure Otis and his immediate family's right to continue to enjoy the family land. Both the duration and the price of Otis' option are reasonable and as such must be upheld. Plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is granted. Costs assessed against the Plaintiff.