Vera Ann LIBEAU, Plaintiff,

v.

Janet Mary FOX, and Elena
A. Vargas, Defendants.

C.A. No. 2308.

Court of Chancery of Delaware,
New Castle County.

Submitted: May 31, 2005.
Decided: June 16, 2005.

Dean A. Campbell, Esquire, Hudson Jones Jaywork & Fisher, LLC, Georgetown, Delaware, Attorney for Plaintiff.

Mary Robin Schrider–Fox, Esquire, Tunnell & Raysor, P.A., Georgetown, Delaware, Attorney for Defendants.

## OPINION

STRINE, Vice Chancellor.

### I. *Introduction*

This dispute involves a falling out among three friends over their jointly owned beach house. The plaintiff, Vera A. Libeau, and the defendants, Janet M. Fox and Elena A. Vargas, purchased a proper-ty in Bethany Beach (the "Beach House"), in December 1986. Over the years, the Beach House's value has increased dramatically and Libeau now wishes to extract her pro rata share of that value by selling the Beach House, or her share in it. Fox and Vargas wish to retain the Beach House for their own enjoyment, realizing that they would likely be unable to replicate, at today's prices, the ability to spend time at the beach they secured through their investment with Libeau nearly twenty years ago.

The plaintiff and the defendants—whom I will define collectively as the Housemates—had anticipated that their mutual desire to use the Beach House as a summer retreat might someday erode, and that one or more of them might want to sell. To address this eventuality, the Housemates signed a contract (the "Agreement")[1] at the time they purchased that set forth the circumstances and conditions under which one or more of them could cause a sale of an interest in the Beach House or force the sale of the entire Beach House. Having lived with the Agreement since 1986, Libeau now seeks to avoid her obligations under it in order to more profitably cash in on her share of the Beach House's appreciated value. Libeau relies on two separate arguments to achieve that end.

Initially, Libeau claims that the Agreement, although it contains very specific and clear language limiting the ability of any one of the Housemates to sell her individual interest in the Beach House, does not constitute an effective, knowing waiver of the statutory right of partition. Therefore, she seeks to have this court order a partition sale of the Beach House,

---

1. JX A, Agreement of Joint Ownership between and among Janet Mary Fox, Vera Ann Libeau, and Elena Aurora Vargas dated De-cember 17, 1986 (hereinafter "the Agreement").

overriding the clear intention and terms of the Agreement.

In this opinion, I conclude that the Agreement's plain terms, which Libeau clearly understood, are flatly inconsistent with a claim for partition. Libeau knew when she signed the Agreement that she was giving up any right to force a sale of the Beach House unilaterally. Therefore, Libeau's demand for partition is a plea for her to be permitted to dishonor her long-standing contract with her Housemates. Under Delaware law, a contract may validly waive the right to seek partition; the Agreement is such a contract and Libeau is bound by it.

Second, Libeau claims that the Agreement constitutes an unreasonable, enduring restriction on the free alienation of land (i.e., the Beach House) and therefore is invalid under Delaware common law. As she interprets our common law, any contract that would inhibit a co-owner of residential property from exiting, at any time, on terms that allow her to sell to a party who could then immediately force a partition sale, is unreasonable. The unreasonableness supposedly stems from the co-owner's inability to promise any buyer that he will, through the threatened or actual exercise of partition rights immediately after purchase, be able to force a sale of the entire property, and monetize his pro rata share of the entire property's value. Because, by the Agreement's terms, any buyer of Libeau's interest would have to share the Beach House with Fox and Vargas, so long as that was Fox's and Vargas's joint wish, Libeau claims she is being unreasonably restricted from selling her interest in the Beach House for a pro rata share of the price the Beach House would sell for if it was sold in its entirety.

For reasons I explain, I largely reject Libeau's contention that the Agreement unreasonably restricts the alienability of land. Although the Housemates drafted the Agreement without legal assistance, it provides a rational exit mechanism for any single Housemate who desires to sell her interest. That exit is specifically designed—as Libeau knew and agreed—not to permit any single Housemate to disturb the others' continued right to enjoy the Beach House, but it does provide a Housemate who wishes to exit a reasonable and viable option to obtain cash liquidity. The mere fact that the exit is not equivalent to partition does not mean it is unreasonable. Nothing in Delaware public policy regarding the use of land renders unreasonable the clear objective of the Agreement—to permit three middle-class working professionals without great means to secure a seaside haven that each could use throughout her lifetime, so long as two of them continued to share that objective. Rather, what would be inconsistent with Delaware public policy would be to permit Libeau to flout her long-standing contractual obligations to her Housemates, thereby divesting them of the benefits of their Agreement and endangering their ability to enjoy the Beach House during their retirement.

In one comparatively minor respect, however, I conclude that the Agreement should be reformed. Although the Agreement's terms are reasonable during the lifetimes of the three Housemates, they are, as written, potentially perpetual. That potential is a modest one because it is more likely that, through intervening circumstances, the Agreement will expire. Nonetheless, the contract itself does not foreclose the continuation of the restrictions for generations. In this sense, even the defendants recognize that the Agreement might usefully be reformed. To address this unreasonable feature of the Agreement, I use my equitable powers to

craft a fixed end date for the Agreement, protecting the Housemates' interest in continued use of the Beach House during their lifetimes, but phasing out the restrictions on alienation when all of the Housemates have died or sold their interests. This mild reworking avoids any unreasonably enduring restraint on alienation while retaining, as far as practicable, the contractual rights of the parties.

## II. *Factual Background*[2]

The Housemates have known each other for a long time. Libeau first met Fox through a mutual friend approximately thirty years ago. In 1980, Libeau, Fox and Vargas began renting a beach house jointly with ten other people. That rental arrangement lasted through 1986. When it ended, several of the renters looked for a house to purchase jointly. By the time the Beach House was found, only Libeau, Fox, and Vargas were left in the search. On December 29, 1986 they jointly purchased the Beach House, which is located at Lot No. 7, Admiral Road, Tower Shores, North Bethany Beach, Delaware, each as a one-third owner. The purchase price was $162,500, and each of the Housemates contributed $13,000 towards the purchase, with the rest of the price coming from a mortgage loan.[3]

The Housemates' purpose for buying the Beach House was not to make a financial investment. Rather, they desired—as three working professionals earning the solid but hardly extravagant wages paid to civil servants who perform skilled jobs for the federal government in the nation's capital—to pool their funds and purchase a home that each could use as a vacation and weekend haven. To the extent that their objectives were in any way financial, it was only in the instrumental sense that by joining together, the Housemates could make possible an end that they, as individuals, could not secure.

Because the Housemates desired to acquire the Beach House for personal use, they crafted the Agreement to set forth and protect that expectation. The Agreement was not drafted by a lawyer but it reflects the fact that the Housemates were educated professionals who could capture complex thoughts in English sentences. As important, the Agreement reflects that the Housemates were close, personal friends who were not seeking to profit at the expense of one another. None of the Housemates, then or now, was married or had children. For that reason, the Housemates had more personal freedom to order their financial affairs in that they could be less concerned about leaving their share of any investment in the Beach House to a close relative who might expect (rightly or wrongly) to be an object of their testamentary beneficence.

Consistent with their objectives and close friendship, the Housemates decided, after discussion, to take possession of the Beach House as joint tenants with rights of survivorship. This form of ownership is both recorded in the deed[4] and recited in the Agreement,[5] and reflected their intention that no Housemates' relations or heirs

---

**2.** These are the facts as I find them after trial.

**3.** While there are gaps in the record on the current financial status of the house, the record shows that the Beach House was purchased in 1986 for $162,500, with Libeau (and, implicitly, both Fox and Vargas) contributing $13,000 to the down payment, and with a mortgage being taken out for the remainder. *See* JX C; JX D; Tr. at 17–18; Pl.

Post–Tr. Rep. Br. at 5. There is no evidence in the record as to the current status of that mortgage, or of any subsequent mortgage on the property.

**4.** JX C.

**5.** Agreement at ¶ 3.

would be entitled to force the remaining two out in the event of someone's death. Rather, if one of the Housemates died, the Beach House would continue to benefit and be used by the survivors. All the Housemates voluntarily and knowingly accepted this decision and signed both the deed and the Agreement that reflected this choice.[6] The inclusion of this provision makes clear that the Housemates' primary objective was enjoying the use of the Beach House.

Likewise, the Housemates crafted provisions to address the possibility that one or more of them might, at a later time, desire to sell her interest in the Beach House. Fox drafted the Agreement, with input from both Vargas and Libeau, largely to address this concern. The design of those provisions was also consistent with the Housemates' goal of purchasing the Beach House as a haven that could be used during their lifetimes, but balanced that objective against the pragmatic fact that if one or two of the original Housemates wanted to get out, a mechanism was needed to provide that exit. The Agreement respects both of these needs by clearly indicating that any party to the Agreement has the right to sell her share at any time, provided the other Housemates are first notified in writing, and by providing the parties that remain with various rights of first refusal.[7]

In the event that any two of the three Housemates wants to sell the Beach House, the Agreement provides that the remaining Housemate must first be offered the opportunity to purchase the others' shares. But, if the remaining House-mate does not purchase the others' shares, the two selling Housemates can compel the sale of the entire property, with each of the three owners receiving a pro rata share of the proceeds. Thus, whenever a majority of the Housemates wants to sell, the Beach House will be sold, or ownership will be consolidated in a single owner.[8]

When only one Housemate wants out, the Agreement provides an even more detailed, two-step method for exit that strives to balance the interests of the Housemate who wants to depart with the interests of the Housemates who wish to continue to enjoy the Beach House. Therefore, the Agreement provides that the selling Housemate must first offer her share to the other Housemates on commercially reasonable terms (as established by an appraisal procedure in the event that no accord can be reached).[9] Thus, as is the case when two Housemates wish to sell, the Agreement provides an opportunity for the non-selling Housemates to consolidate ownership of the Beach House if either or both remaining Housemates agree to buy the exiting Housemate's share—a right of first refusal.

In the event that the remaining Housemates initially decline to purchase the single outgoing Housemate's share, however, the Agreement goes on to provide a second opportunity for the remaining Housemates to purchase once the selling Housemate has found a buyer and received a bona fide offer. At that time, the remaining Housemates must be informed of the offer and given the opportunity to "veto" the sale by "(1) purchas[ing] the interest themselves

---

6. The Housemates did consider alternative ownership arrangements. At one point before purchasing, the women considered a partnership agreement as a form of ownership, but rejected that idea because they intended to use the property for personal enjoyment and did not intend to rent it out.

7. Agreement at ¶¶ 4–8.

8. Agreement at ¶ 7.

9. Agreement at ¶ 4.

at the same price and on the same terms and conditions, or (2) find[ing] another purchaser who will purchase the interest at the same price and on the same terms and conditions, or (3) selling [their] interest in the property."[10] This second bite at the apple, a second right of refusal when only one Housemate wishes to sell, allows the remaining Housemates some say in who will become a co-owner with them, or at least permits them to exit rather than continue to co-own the Beach House with that prospective buyer, once identified, if they so choose. In this way, the Agreement emphasizes and protects the interests of the two Housemates who choose to remain.

In addition to providing this double right of refusal, the Agreement also addresses a potential loophole. If a third party were to buy the selling Housemate's one-third share, the Agreement would not continue to protect the remaining Housemates unless that new owner also agreed to be bound by the terms of the Agreement. Absent agreement, the new owner could sell her newly acquired one-third share to anyone, or even seek partition. To address this possibility, the Housemates included paragraph 9 of the Agreement, stating in relevant part:

> If one or more of the parties sells her interest to someone other than the other parties to this agreement, the purchaser shall become subject to this agreement upon the effective date of the sale.[11]

As laypersons, the Housemates did not realize that their Agreement would have the most potency, especially against future buyers, if it was notarized and recorded along with the Deed. Nonetheless, I have no doubt that each of the Housemates signed and understood the Agreement, and considered that document to be a binding contract.

After signing the Agreement, the Housemates abided by its terms for approximately sixteen years. The provisions of the Agreement that set forth the division of maintenance costs for the Beach House were followed.[12] Each of the Housemates enjoyed the Beach House at various times; each has a bedroom in the house, and they visited, both separately and together, many times over the years. Consistent with their stated intention to use the house for their own personal enjoyment, the Housemates only rented the Beach House out on one occasion. That exception demonstrates the rule, because the one exception involved a rental to a mutual friend.

Over a decade and half of tranquility began to unravel in 2002. By that time, each of the Housemates was reaching retirement age. None had married but Libeau's interest in continuing in the Beach House was flagging. In July 2002, a local real estate agent stopped by the Beach House and indicated to Libeau that he could sell the house for between $850,000 and $950,000, a return of over five times the original $162,500 purchase price paid in 1986.

Libeau thought that this would be a good time to sell and tried to initiate discussions with Fox and Vargas, while continuing her dialogue with the real estate agent who supplied additional information supporting his valuation of the property.[13]

---

**10.** Agreement at ¶ 6.

**11.** Agreement at ¶ 9.

**12.** Tr. at 14–15. Some modification of the application of paragraph 2 occurred when Vargas became a U.S. citizen and the proper-

ty taxes could be handled differently. *Id.* at 15.

**13.** Libeau testified that she had always intended the property as an investment, that she expected that the parties would sell in about

Libeau shared this information with Fox and Vargas. After some delay, in October 2002, the Housemates talked candidly about Libeau's desire to sell. In that discussion, Fox and Vargas indicated that they could not afford to buy Libeau's share at the $250,000 to $300,000 range she was contemplating, nor did they wish to sell; they therefore referred Libeau to the Agreement that provided the exit mechanism that they had all agreed to back in 1986. Without admitting the validity of the agreement, Libeau obtained an appraisal of $750,000,[14] and formally offered her share to Fox and Vargas, in writing, for $250,000. After considering the offer, Fox and Vargas declined.

Rather than continue to sell her interest in the Beach House through the exit mechanism provided in the Agreement, Libeau instead chose to file this law suit and abandoned any marketing of her interest. Fox, however, continued to seek a practical, commercial solution that did not involve a litigated outcome. To that end, Fox actively began to search out buyers for Libeau's share. As a result of Fox's efforts, a builder and co-member of the Tower Shore's board with Fox, who had extensive familiarity with the Tower Shores development, made several offers for Libeau's one-third share, the first for $170,000, and the most recent, after the appraisal was updated and increased, for $230,000. Libeau refused the first offer without a counteroffer, but has indicated that negotiations continue with respect to the second offer.[15] As of today, Libeau has apparently not reached any out-of-court arrangement that satisfies her.

### III. *Legal Analysis*

In this post-trial opinion, my tasks are largely to determine: 1) whether the Agreement constitutes an effective waiver of Libeau's statutory right to seek partition; and 2) whether the Agreement's restrictions on Libeau's ability to sell her interest are valid.

A. *The Right to Partition May Be Trumped By Contract: Libeau Waived Her Statutory Right To Partition*

Delaware law recognizes the long-standing common law principle that there must

---

ten years or when one of them married, and that the Housemates had informally discussed selling if the value of the house rose to a certain level, either $750,000 or $1,000,000. But the Agreement itself contains no time limitation, and Fox flatly denied having conversations with Libeau about selling if the value rose to a certain level, pointing out that no one anticipated such a dramatic rise in value at the time of purchase. I find Fox's version of events the more credible, especially given the plain terms of the Agreement and the Housemates' personal use of the Beach House. Indeed, if Libeau intended to sell at a future time to capture gains, establishing a joint tenancy with rights of survivorship seems an odd vehicle for such an investment strategy.

**14.** Libeau's expert has updated his appraisal twice in the two years since the initial appraisal was completed on March 4, 2003. His most-current report, dated March 15, 2005, estimates the value of the Property at $950,000.

**15.** Pl. Pre–Tr. Rep. Br. at 1. Both at trial and in her papers, Libeau suggests that in that the bidding party's offers are somehow "suspect" because he is friendly to Fox and because defendants' counsel was informed of each offer. *Id.;* Tr. at 99. Nothing in the record supports this innuendo and I therefore ignore it. At trial, the bidder explained that if his offer were accepted, he intended to construct a duplex on the site. Fox and Vargas would then retain one half, while he kept, or more likely sold, the other half as his profit on the deal. Fox similarly testified that this was the understanding, though, like the bidder, confirmed that the details of that arrangement would only be worked out after, and if, Libeau accepted a price. This seems a potentially satisfactory result for all involved, albeit one that, as yet, has not been embraced by all parties.

be a default rule that permits co-owners of land, who cannot agree on how to use it, to end their joint tenancy. The statutory partition action is the practical means that Delaware uses to break these unwholesome stalemates.[16] The partition statute allows joint tenants to petition this court to sever their interests in real property.[17] Through this means, the owner who wants to get out is able to obtain liquidity. The other owners have a chance, but not the right, to buy. The forced sale will, so the theory goes, put the property to its highest and best use through transfer to the one willing to pay the most for it.

The right to partition has been called an "absolute" one,[18] but that word is more than a tad too strong.[19] Partition is a practical method to unwind relationships that, if not ended, threaten to leave some parties without fair use of a jointly owned asset, to tie up the development and efficient use of property, and, even worse, to become so frustrating that the unhappy co-owners descend into uncivil conflict. Like § 273 of our corporation law, the partition statute recognizes that there must be a default mechanism providing resolution when persons have locked (or find) themselves in a joint relationship that is not working consensually.

■ Because it is a statutory default provision, it is unsurprising that the absolute right to partition might be relinquished by contract, just as the right to invoke § 273 to end a joint venture or to seek liquidation may be waived in the corporate context.[20] As this court has previously noted, with a touch of irony, the "absolute right [to partition], however, is subject to some limitations."[21] The important one here is that the right may be waived by contract. When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract.[22]

Such public policy interests are not to be lightly found, as the wealth-creating and peace-inducing effects of civil contracts are undercut if citizens cannot rely on the law

**16.** 25 *Del. C.* §§ 721–51. In her complaint, Libeau did not make an argument based on another common law rule favoring free alienation, the Rule Against Perpetuities. She did raise the Rule in an untimely manner in her Pre–Trial Reply Brief. Pl. Pre–Tr. Rep. Br. at 5. At trial, however, she withdrew this argument. Tr. at 134. Accordingly, I do not address it in this opinion.

**17.** *See Peters v. Robinson,* 636 A.2d 926, 929 (Del.1994) ("The purpose of a partition proceeding is to eliminate a present concurrent interest in the same property so that each owner may enjoy and possess his or her interest in severalty.") (citations omitted).

**18.** *See Kuck v. Cropper,* 1978 WL 22465, at *3 (Del.Ch. Dec.5, 1978) (citing 68 C.J.S. *Partition* § 21 "Right to Partition in General," p. 33).

**19.** *See McInerney v. Slights,* 1988 WL 34528, at *6 (Del.Ch. Apr.13, 1988) ("The rule against unreasonable restraints on alienation is based solely on social policy, not on the rights of the party on whom the restraint is imposed.")

**20.** *See, e.g., In re Delaware Bay Surgical Services,* C.A. No. 1212–S (Del. Ch. Jan. 28, 2002) (declining to exercise judicial discretion under 8 *Del. C.* § 273 because an alternative contractual exit mechanism existed).

**21.** *Kuck,* 1978 WL 22465, at *3.

**22.** *Cf. Maddock v. Greenville Retirement Community, L.P.,* 1997 WL 89094, at *7–8 (Del.Ch. Feb.26, 1997) ("Only a very strong showing that a contract term is a gross violation of the policies embodied in this common law rule [that reasonable restraints be upheld] would permit [plaintiff] to escape the economic bargain that he entered.") (citations omitted).

to enforce their voluntarily-undertaken mutual obligations. As our courts have recognized:

> [T]he right to contract is one of the great, inalienable rights accorded to every free citizen.... 'If there is one thing more than any other which public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting' and that this freedom of contract shall not lightly be interfered with. We also recognize that freedom of contract is the rule and restraints on this freedom the exception, and to justify this exception unusual circumstances should exist.[23]

Consistent with the general freedom to contract, it has been held, in Delaware and in other states, that a person may contractually give up her right to seek partition.[24]

To ensure that the statutory right to partition is not arbitrarily lost, Delaware requires that any contractual relinquishment of the partition right be "by clear affirmative words or actions."[25] Libeau contends that the Agreement is insufficiently clear and affirmative to waive her statutory right to partition because the Agreement does not specifically state that the Housemates were waiving their rights to seek partition.

■ That argument, however, misunderstands the clarity required for an effective waiver. The waiving contract need not contain an explicit disclaimer of partition rights. Rather, the contract need only contain a procedure for the co-owners to sell their interests that is inconsistent with the later maintenance of a partition action. When a contract provides an exit mechanism that is subject to certain conditions, and the filing of a partition action would allow an exiting party to escape those conditions, the exiting party's decision to sign the contract constitutes a waiver of the statutory right of partition.[26]

■ Those circumstances exist here. Libeau acknowledged both in the pre-trial stipulation and at trial that she knowingly and voluntarily entered into the Agreement. She further admitted that, at the time she signed the Agreement, she read and understood both the restrictions that it placed on her ability to sell her share, as well as what would happen to her share in the event of her death.[27] In other words, Libeau knew that she had contractually

**23.** *State v. Tabasso Homes*, 28 A.2d 248, 252 (Del.Gen.Sess.1942) (citations omitted).

**24.** *See Kuck*, 1978 WL 22465, at *3 ("[W]ritten agreements not to partition are sanctioned if they are fair and equitable.") (citing *Hotchkin v. Hotchkin*, 105 N.J.Super. 475, 253 A.2d 184 (1969)); *see also* 59A Am.Jur.2d *Partition* § 50 (2004) ("Although partition is a remedy much favored, a cotenant is not entitled to partition after entering into an agreement not to partition.") (footnotes omitted); Wade R. Habeeb, Annotation, *Contractual Provisions as Affecting Right to Judicial Partition*, 37 A.L.R.3d 962, at § 3 (2005) ("Generally, it may be said that a cotenant is not entitled to maintain an action for partition, where he has entered into an agreement not to partition.").

**25.** *In re Appraisal of Ford Holdings, Inc. Preferred Stock*, 698 A.2d 973, 979 (Del.Ch.1997); *see* 25 *Del. C.* §§ 721–51.

**26.** *See JLF, Inc. v. NJE Aircraft Corp.*, 1988 WL 58274, at *2 (Del.Ch. June 2, 1988) ("The right to partition may, however, be impliedly removed or altered by an agreement giving a right of first refusal to another co-tenant.") (citation omitted); *see also Michalski v. Michalski*, 50 N.J.Super. 454, 142 A.2d 645, 649 (1958); *see generally* Wade R. Habeeb, Annotation, *Contractual Provisions as Affecting Right to Judicial Partition*, 37 A.L.R.3d 962, at § 7[b] (2005) ("Where the purpose of the contract entered into between the cotenants would be defeated by partition, an agreement not to partition may be implied.").

**27.** Pre–Tr. Stip. at 2; Tr. 24–27.

given up the opportunity to force a sale of the Beach House over the objections of her Housemates.

In light of this awareness and the plain words of the Agreement, Libeau waived her statutory right to seek partition.

B. *The Agreement Does Not Unreasonably Constrain Alienation During the Housemates' Lifetimes But Its Indefinite Duration Justifies Limited Reformation*

This brings us to Libeau's second argument: the Agreement's restrictions on her ability to sell her interests violate public policy because the restrictions are so substantial and enduring as to make it impractical for her to exit at an economically attractive price. In pressing this argument, Libeau relies upon the proposition that "[n]o individual may exercise his broad power to enter into contract relations with another so as to offend against what the law deems to be sound public policy."[28]

■ The problems for Libeau in invoking this principle are several. First of all, Libeau underestimates the difficulty of grounding a claim for the avoidance of a contract on a conflict with public policy. Delaware courts are rightly reluctant to accept such arguments. And when they do, it is not because a person has entered into a contract that has become financially inconvenient for them to honor, but because the enforcement of the contract threatens a well-recognized policy interest of concern to our polity in general. That is, this exception does not exist as a sword for parties to avoid their contracts when avoidance suits their personal interests, but as a shield to protect the community in general when the terms of a contract endanger the public interest.

In the area of property law, our common law has for some time recognized, in a tailored and limited way, the proposition that contractual restrictions on the alienability of land can be so severe as to become, as a public policy matter, unreasonable. As I will soon describe, the ancient vintage of this proposition is not now so much its strength, but its vulnerability. Why? Because the public policy considerations that undergird that proposition bear little relation to our current circumstances, as demonstrated by more recent enactments of our General Assembly.

■ The considerations animating the principle that contractual restrictions on alienation can be unreasonable were well summarized by Chancellor Allen in *McInerney v. Slights:*

> The rule against unreasonable restraints on alienation is based solely on social policy, not on the rights of the party on whom the restraint is imposed. Underpinning the rule is the belief that development should be encouraged. Under this view, property will be put to its highest and best use if the current owner is allowed to sell the property to others who intend to use it more productively. On the other hand, the law is sensitive to the need for some restraints that occasionally arise. For example, a tenant who expects to make large investments to improve the premises may be willing and able to do so only if the owner is willing to give him the option to purchase the property at a fixed price. Accordingly, the rule is not that all restraints are prohibited. Rather, a bal-

---

**28.** *Maddock,* 1997 WL 89094, at *5 n. 17 (quoting *Greene v. E.H. Rollins & Sons,* 2 A.2d 249 (Del.Ch.1938)).

ance is struck; only "unreasonable" restraints are prohibited.[29]

As the reader might have discerned, the social policy adverted to in *McInerney* is hoary, emanating from a time when this nation was not fully settled and when it was thought desirable to facilitate the economic exploitation of land in the larger public interest. Restraints that tended to inhibit the transfer of land to the seller willing to pay the highest price were therefore deemed suspect. Notably, this social policy was discerned by judges applying and evolving our common law.

■ As a common law judge in Delaware in 2005, I cannot ignore the different circumstances that confront our state now. Rather than being preoccupied with ensuring that available land can be freely transferred for commercial exploitation, our Governors and General Assembly have instead focused on meeting the challenges of responsibly managing a settled territory with a much larger population. To that end, they have enacted numerous statutes designed to channel commercial development into specific areas, to encourage the preservation of open space and agricultural lands, and to limit sprawl.[30] Far from expressing an unbridled desire to see land transfer to whoever will pay the highest price, the political branches of government have attempted to strike a reasoned balance that facilitates the rational procession of land development, while protecting uses of land (for homes and farms, e.g.) that, although not generating the rents of a big

box shopping center, are thought socially valuable.

Therefore, at this stage, it is not tenable for a judge evolving our common law to consider a restraint on the alienation of land unreasonable simply because that restraint might have the effect of diminishing a party's ability to get the same price that she might obtain if she was subject to no restraint at all. If there was a legitimate, non-invidious reason for the restraint in the first instance, the selling party's desire to avoid the restraint is of no moment. Right now, for example, our State pays farmers to acquire their development rights, thereby disabling them from selling their land for non-agricultural use.[31] The farmers' upfront decision to accept the benefits of the deal compensates them for the restriction on their ability to alienate the land to commercial developers. Put simply, that a party who availed herself of the benefits of a property ownership bargain now wishes to shun the accompanying restrictions on her right to sell is not a circumstance that presents any obvious conflict with a larger Delaware public policy. Something much more substantial has to be shown.

With this understanding of current Delaware public policy—as expressed by the political branches—firmly in mind, I now turn more specifically to consider Libeau's argument that the Agreement is offensive to our polity's best interests. Consistent with the judiciary's reluctance to override contracts based on general public policy arguments, our courts have used a fact-

---

29. *McInerney v. Slights*, 1988 WL 34528, at *6 (Del.Ch. Apr.13, 1988).

30. *See, e.g.*, Delaware Agricultural Lands Preservation Act, 3 *Del. C.* §§ 901–930 (2005); Quality of Life Act of 1988, 9 *Del. C.* §§ 2651–2661 (2005); Land Use Planning Act, 29 *Del. C.* §§ 9201–9206 (2005); Delaware Land Protection Act, 7 *Del. C.* §§ 7501–7510 (2005);

*see also* 22 *Del. C.* §§ 701–711 (2005) (authorizing municipalities to participate in this preservation process by creating planning commissions and formulating comprehensive development plans).

31. *See* Delaware Agricultural Lands Preservation Act, 3 *Del. C.* §§ 901–930 (2005).

intensive approach to examining claims that a restraint on the alienation of an interest in land is contrary to public policy. In *McInerney*, Chancellor Allen drew on factors, laid out in the *Restatement (First) of Property*, that tended to show the reasonableness of a restraint:

1. the one imposing the restraint has some interest in land which he is seeking to protect by the enforcement of the restraint;

2. the restraint is limited in duration;

3. the enforcement of the restraint accomplishes a worthwhile purpose;

4. the type of conveyances prohibited are ones not likely to be employed to any substantial degree by the one restrained;

5. the number of persons to whom alienation is prohibited is small . . .; [and]

6. the one upon whom the restraint is imposed is a charity.[32]

Chancellor Allen also cited to the *Restatement's* articulation of factors tending to show unreasonableness:

1. the restraint is capricious;

2. the restraint is imposed for spite or malice;

3. the one imposing the restraint has no interest in land that is benefited by enforcement of the restraint;

4. the restraint is unlimited in duration; [and]

5. the number of persons to whom alienation is prohibited is large.[33]

As can be seen, several of the factors supporting reasonableness and those supporting unreasonableness tend to be mirror images. For that reason, I will not attempt to apply them sequentially, but consider the conceptually related factors together. Considered in this manner, the *Restatement* factors generally favor the enforcement of the Agreement as a reasonable restraint on alienation.[34]

Several of the factors weighing in favor of a reasonable restraint are present here. Fox and Vargas have a legitimate, non-invidious interest in the property that they are seeking to protect. They, along with Libeau, bought the Beach House to obtain for themselves the reasonable prospect of lifetime enjoyment of a seaside haven. As unmarried civil servants, each of the Housemates was unable to pull off a similar purchase individually, and therefore they banded together to achieve collectively what they could not achieve in isolation. In other words, but for her assent to the restraints in the Agreement, Libeau would not have been able to procure an interest in the Beach House in the first place.

Importantly, the goal of obtaining access to a vacation home for personal, not commercial, use is a common one that is encouraged by our state economic development policies, which seek to attract both visitors and residents to our beach communities. Thus, the essence of the Housemates' original deal was wholly benign and posed no threat to any Delawarean or to our polity as a whole. That the Housemates sought to buy the Beach House to

---

**32.** 1988 WL 34528, at *6–7 (citing *Restatement (First) of Property* § 406 (1944)).

**33.** *Id.* at *7.

**34.** *See Maddock*, 1997 WL 89094, at *7–8 (Del.Ch. Feb.26, 1997) ("As a general rule, conditions on the sale of property which prevent the owner from conveying it when it would be economically efficient to do so *may* constitute an invalid unreasonable restraint on the alienation of property. However, if such restraint is deemed reasonable under the circumstances, it will be upheld.") (emphasis added) (citing 61 Am.Jur.2d *Restraints on Alienation and Use* § 100 at 108–09 (1981) and *Restatement (Second) of Property* § 4.4 (1983)).

actually enjoy it, rather than as an economic investment, might offend some in the Chicago school, but not anyone who appreciates an Atlantic sunrise, a night out at the Starboard, or the serenity of a wintertime walk along the ocean strand. By its very nature, the Agreement among the Housemates was designed to enable them, at low upfront cost, to maximize their enjoyment of life, not their future bank accounts. There is nothing wrong with that goal.

As important, the restraints on alienation in the Agreement do not pursue that goal in an unreasonable, arbitrary, or punitive manner.[35] If a majority of the Housemates want to sell, the Agreement facilitates that result. And even if one Housemate wants out, as Libeau does, the Agreement provides a means for that to be accomplished. But those means are fashioned to fulfill the worthwhile purpose of allowing the non-selling Housemates to continue to use the Beach House for their own enjoyment in that event.

The means the Agreement spells out do come at some economic cost to the selling Housemate. The selling Housemate cannot market her share by telling a buyer that the buyer can, if he or she becomes unhappy with sharing the Beach House with Fox and Vargas, force a partition sale. As a result, buyers are unlikely to pay Libeau one-third of the price that the Beach House would sell for if marketed on an undivided, fee simple basis. As each expert testified, partial interests in land tend to sell at a discount of 20%, or more,[36] to pro rata value of the overall parcels.

But there is no public policy interest thwarted by the mere fact that Libeau cannot reap pro rata value of the sale value of an undivided interest in the Beach House. In the Agreement, Libeau promised Fox and Vargas that she would not do precisely what she is trying to do now. Indeed, she promised that if she died, her share would go to Fox and Vargas. Libeau has no equitable or legal entitlement to renege now, having accepted all the benefits of the Agreement (including her ability to participate in the purchase in the first instance and to use the Beach House for nearly two decades since), or to deny Fox and Vargas their legitimate expectation of continued use of the Beach House. She exchanged that portion of value, as did Fox and Vargas in the event they chose to sell first, to facilitate the initial joint purchase.

The economic evidence in the record also shows that there is no reason to conclude that enforcement of the Agreement will cause unfair injury to Libeau. In fact, she still stands to reap large profits, even with the so-called restraint in place. Libeau has already received an offer for her one-third share in the Beach House from a buyer willing to live under the restraints of the Agreement. The offer price far exceeds the $162,500 price that the Housemates paid for the whole Beach House in 1986, and represents, by any estimation, a substantial return on her initial investment. That is, the Agreement, in practical effect, has left Libeau with a sales option that is economically valuable.[37]

---

**35.** Quite obviously, the Agreement's restraints were not crafted maliciously or for spite by any of the Housemates, and Libeau's attempt to suggest that they are capricious, simply because they were not drafted by an attorney, falls far short of any legally cognizable definition of sanctionable whimsy.

**36.** Tr. 48, 125.

**37.** In this sense, Libeau's situation diverges substantially from the facts of *McInerney*, upon which she so heavily relies. Libeau claims that, like the defendants in *McInerney*, she faces receiving a discount from market value, and suggests that this discount for lack of marketability constitutes an impermissible restraint on alienation. But Libeau overlooks

The final relevant factor that *McInerney* cites also favors the conclusion that the restraints in the Agreement are reasonable because the number of persons affected is small.[38] The public policy implications of enforcing the Agreement are, therefore, slight to non-existent. Thus, all of the relevant factors lean toward a finding that the Agreement is reasonable with one notable exception—the Agreement's potentially unlimited duration; that exception merits a thorough analysis.

The durability of the restraint in the Agreement arises from the theoretical loophole that the Agreement creates in Paragraph 9 through the following language:

> If one or more parties sells her interest to someone other than the other parties to this agreement, the purchaser shall become subject to this agreement upon the effective date of sale.[39]

Read fairly, the Agreement prevents a Housemate from selling to anyone who does not agree to abide by the restrictions on alienation in the Agreement. That is, by preventing a Housemate from selling without obtaining a buyer's acceptance of the Agreement, the Agreement conditions sales on the buyer's willingness to become a signatory to the Agreement. As a re-

---

the critical holding of *McInerney* that "it is the fixed price term, *coupled with* the indefinite term of the right, that, in these circumstances, creates the offense." *McInerney*, 1988 WL 34528, at *7 (emphasis added). Here, because there is no fixed price term, the rights of first refusal granted in the Agreement more resemble the rights granted by the *McInerney* court as a remedy; that is, a right of first refusal of unlimited duration but a right to purchase only on the same terms and conditions that the seller can secure in a bona fide offer. See JX A at ¶ 6. Although the defendants in *McInerney* were precluded by a fixed strike price from participating in any market upside in a rising market, Libeau, by contrast, stands to claim the lion's share of the precipitous rise in beach property value, subject only to the discount that her fractional interest, irrespective of the Agreement's terms, would cause her to suffer.

The facts presented at trial bear out this distinction. Libeau has received an offer of $230,000 for her share. The primary reason that Libeau faces any discount from pro rata value is the simple fact that she owns only one-third of the Beach House. Such a partial ownership position results, as Libeau's own realtor witness admitted, in a discount of at least 20%. Tr. at 48. Any additional discount resulting from other portions of the Agreement emerge as slight given the $230,000 offer. Indeed, the current offer is 92% of the $250,000 that Libeau originally demanded from Fox and Vargas, 77% of the $900,000 mid-range figure that Libeau first heard from a passing realtor back in July 2002, and implies, based on the admitted *minimum* 20% discount for partial ownership, a pro rata valuation of $287,500 for Libeau's share, or a valuation of $863,500 for the entire property—well within the range of the values for an undivided interest in the Beach House espoused by the experts at trial. In light of these economic facts, Libeau's attempt to shoehorn these facts into the *McInerney* model, by suggesting that "effects on marketability of [her] interest, establish a price term that is *practically worthless*, thereby, constructively establishing a fixed price term" is, to put it mildly, unconvincing. Pl. Op. Pre–Tr. Br. at 10 (emphasis added).

38. Libeau argues that the potentially perpetual nature of the restraint might ultimately affect several people. While technically accurate, the Agreement does not, in my view, cast a net that would catch the number of persons necessary to expand the scope affected from the category "small" to the category "large." In seeking to bolster the number of parties affected, Libeau argued in pre-trial briefing that rights of the parties' heirs will also be affected. This argument stems from the mistaken impression that the Agreement attempted to convert a tenancy in common to a joint tenancy without the requisite formality. As was demonstrated at trial, this recitation of the Agreement merely reflected the existing joint tenancy arrangement as effected in the deed itself. See JX C, Tr. at 72–73, 85.

39. JX A at ¶ 9.

sult, the buyer of Libeau's share must agree and take up the Agreement. If either Fox or Vargas then sells her share, that new buyer must also take up the Agreement, and so on. Therefore, there remains the potential for the Agreement's restrictions on alienation to remain in effect indefinitely, so long as two or more parties to the Agreement remain among the living.

■ Although it is more likely that the restraints on alienation will disappear through evolving circumstances—such as a voluntary decision by a majority of the Housemates to sell, or the death of a majority of the Housemates and the concentration of ownership in the remaining Housemate—that termination is not absolutely certain. Libeau couples this potentiality with the observation that agreements never to partition are routinely found unreasonable,[40] and concludes that restrictions of unlimited duration are, in general, inherently unreasonable.[41]

Under our law, even a reasonable restraint can become unreasonable if it persists indefinitely. Although the Agreement does not unreasonably prohibit the sale of Libeau's interest now, the perpetuation of the Agreement indefinitely will, if it transpires, result in future conflict and an inhibition on transfer that is unreason-

able. The fashioning of a lifetime arrangement among three close friends protecting the reasonable expectation of each to use a beach house during her lifetime, absent agreement among a majority of them to sell, is a reasonable goal. Setting in motion a multigenerational group home of sun and surf seekers is not, and was, I conclude, never the goal of the Housemates here.[42]

■ The fact that the Agreement's duration might pose a threat of unreasonableness, however, does not compel or even authorize this court to take the crude step of invalidating the Agreement in its entirety. Rather, in recognition of the law's reluctance to override private contracts limiting alienation on grounds of public policy, the court may reform the restriction on alienation in a manner that preserves the reasonable intent of the contracting parties, while revising the unreasonable aspects of the parties' contract.[43]

Here, what is unreasonable is the duration of the restraints in the Agreement beyond the lifetime of the original Housemates. The provisions of the Agreement, including the joint tenancy with rights of survivorship, were designed to protect Libeau, Fox, and Vargas, not future generations. But the effect of binding future

**40.** *See* Wade R. Habeeb, Annotation, *Contractual Provisions as Affecting Right to Judicial Partition,* 37 A.L.R.3d 962, at § 8 (2005) ("It has been held or recognized that an agreement never to partition property is not enforceable.") (collecting cases).

**41.** Although the Agreement differs from a simple agreement never to partition in the important respect that it creates an alternative mechanism for the sale of a partial interest, as opposed to barring any sale outright, Libeau is nonetheless correct that restraints of indefinite duration are generally not favored. *See Kuck v. Cropper,* 1978 WL 22465, at *3 (Del.Ch. Dec.5, 1978) ("In order for an agreement not to partition to be enforceable,

it must be in writing and for a reasonable period of time.") (citing *Hotchkin v. Hotchkin,* 105 N.J.Super. 475, 253 A.2d 184 (1969)).

**42.** None of the parties to the Agreement intended to create a document that would survive in perpetuity. Fox, for example, anticipated that the document would not survive the original signatories. Tr. at 15, 97.

**43.** *See, e.g., McInerney,* 1988 WL 34528, at *7 (implying a severability clause, striking an offending contractual provision, and reforming the rights of the parties consistent with what they would and could have validly agreed to in the first instance).

buyers of interests in the Beach House is to perpetuate a unique contract, designed for three people, and to possibly (if not likely) create a perpetual encumbrance on the sale of the Beach House. This durational component has a present effect on Libeau because it must be priced by a buyer, who must not only consider the reality that Fox and Vargas have rights that may last for many years, but also the possibility that the restrictions will continue beyond Fox's and Vargas's lives.

■■■■ To remedy this problem, however, does not require the crude invalidation that Libeau seeks. When faced with agreements containing restrictions on alienation of unlimited duration, courts have sometimes found the agreements invalid, but, alternatively, have held the restriction valid for a limited and reasonable time,[44] or, as in *McInerney*, reformulated the agreement and the parties' interests so that the perpetual agreement did not create a restraint.[45] In this way, courts refrain from voiding contracts where possible,[46] and preserve that part of the contract that makes sense.[47]

Here, any reformation must continue to protect the critical contractual right that Fox and Vargas bargained for and obtained—the right to continue to use the house through their retirement. This intention is indicated, among other ways, by the form of conveyance as a joint tenancy with rights of survivorship, which prevents any party's distant family member from inheriting and depriving the surviving owners of enjoyment of the property through a partition action. Both parties have urged, as a fallback position, that I might eliminate paragraph 9 of the Agreement, subjecting subsequent purchasers to the Agreement, but hold the parties themselves bound by the Agreement. As a practical matter, this fails to protect Fox's and Vargas's interests for the same reason that paragraph 9 was presumably added—absent paragraph 9, nothing prevents the purchaser of Libeau's interest from seeking partition immediately after sale.

In order to resolve the unreasonable effects that might arise because of the Agreement's lack of a terminal date without unfairly depriving Fox and Vargas of their reasonable contractual expectations, it is therefore necessary to do more than strike paragraph 9. Instead, paragraph 9 must be reformed to provide that any purchaser of a one-third share in the Property will have to live under the restrictions of the Agreement until the earlier of a decision by two or more of the original Housemates to sell, or until all of the original purchasers, Fox, Vargas, and Libeau, have either sold their interests or died.[48] Upon

---

**44.** *See, e.g., Michalski v. Michalski,* 50 N.J.Super. 454, 142 A.2d 645 (1958) (holding a restrain on partition valid until the death of one of two cotenants); *Rosenberg v. Rosenberg,* 413 Ill. 343, 108 N.E.2d 766 (1952) (holding an implied agreement not to partition to be valid for the period measured by the lives of the parties).

**45.** *See McInerney,* 1988 WL 34528, at *7.

**46.** *See Sexton v. State Farm Fire and Cas. Co.,* 2003 WL 23274849, at *5 (Del.Super.Dec.30, 2003) (suggesting that overuse of public-policy voiding would "unjustly interfere with the right of freedom to contract").

**47.** *See McInerney,* 1988 WL 34528, at *7 (noting that reformation can leave the party "who has done no wrong, with so much of his agreement as can be enforced").

**48.** The lifespan of the contracting parties has been looked to by courts as a reasonable period in similar situations when no guidance is provided by the document itself. *See, e.g., Michalski v. Michalski,* 50 N.J.Super. 454, 142 A.2d 645 (1958), *Rosenberg v. Rosenberg,* 413 Ill. 343, 108 N.E.2d 766 (1952).

the earlier of those events, the entire Agreement will terminate and any existing co-tenant may seek to sever their interests via partition. In connection with this reformation, counsel for the parties shall craft language ending the joint tenancy with rights of survivorship and replacing it with a tenancy in common. This will enable each of the three original Housemates to sell or to devise her share to a party of her choosing.[49] The change in the nature of the tenancy should, of course, be tied into the protections for Fox and Vargas outlined above, committing any co-tenant to respect the Agreement until an event triggering termination has occurred.

The formulation of a fixed end date to the Agreement thus eliminates any threat of unreasonableness created by the possibility of unlimited duration and, therefore, also improves the economic attractiveness of Libeau's share. The reformation of the nature of the joint tenancy also has the value of protecting Fox and Vargas, by insulating them from having a new, ghoulish co-owner who buys simply to play the actuarial lottery, betting that they will die first. Most important, however, the nature of this reformation ensures that the contractual right that Fox and Vargas bar-

gained for, the ability to enjoy the beach during their retirement years if they both jointly wish to continue to do so, is respected and preserved. Reformation of the Agreement in this manner reflects my best effort to capture the contract that the Housemates would have crafted in 1986 had they envisioned the precise circumstances they now confront and had they pondered the possibility that the Agreement might survive their lives.

## IV. *Conclusion*

For all the reasons listed above, judgment shall be entered for Fox and Vargas and the Agreement shall remain enforceable, but paragraph 9 of the Agreement shall be stricken and the rights of the parties shall be reformed as outlined above. Counsel for the parties shall craft implementing contractual language and a conforming final order within 20 days. Each side shall bear its own costs.

---

49. Of course, if Fox and Vargas wish to maintain the mutuality of the Agreement with respect to their individual interests, they can accomplish this by an appropriate devise in their respective wills.