# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JD HOLDINGS, L.L.C., JONESBORO FUNDING LLC, and EASTGATE FUNDING LLC,   )
   )
   )
Plaintiffs,   )
   )
   )
v.   )   C.A. No. 7480-VCL
   )
   )
JACQUELINE A. DOWDY, as Trustee of THE REVOCABLE TRUST OF JOHN Q. HAMMONS, DATED DECEMBER 28, 1989, AS AMENDED AND RESTATED; JACQUELINE A. DOWDY, as the Personal Representative of the JOHN Q. HAMMONS ESTATE; GREGGORY D. GROVES, as Trustee of THE REVOCABLE TRUST OF JOHN Q. HAMMONS, DATED DECEMBER 28, 1989, AS AMENDED AND RESTATED; THE REVOCABLE TRUST OF JOHN Q. HAMMONS, DATED DECEMBER 28, 1989, AS AMENDED AND RESTATED; HAMMONS OF NEW MEXICO, LLC; HAMMONS OF FRISCO, LLC; HAMMONS OF COLORADO, LLC; HAMMONS OF ARKANSAS, LLC; HAMMONS OF SOUTH CAROLINA, LLC; CITY CENTRE HOTEL CORPORATION; HAMMONS OF HUNTSVILLE, LLC; HAMMONS OF OKLAHOMA CITY, LLC; HAMMONS OF LINCOLN, LLC; HAMMONS OF FRANKLIN, LLC; HAMMONS OF RICHARDSON, LLC; RICHARDSON HAMMONS, LP; JOHN Q. HAMMONS CENTER, LLC; CHATEAU LAKE, LLC; JQH – EAST PEORIA DEVELOPMENT, LLC; JOHN Q. HAMMONS FALL 2006, LLC; JQH – FT. SMITH DEVELOPMENT, LLC; JQH – GLENDALE, AZ DEVELOPMENT, LLC; JQH – KANSAS CITY DEVELOPMENT, LLC; JQH – LA VISTA III, DEVELOPMENT, LLC; JQH – LA VISTA CONFERENCE CENTER DEVELOPMENT, LLC; JQH – MURFREESBORO, DEVELOPMENT, LLC; JQH – NORMAN DEVELOPMENT, LLC; JQH – NORMAL DEVELOPMENT, LLC; JQH –

OKLAHOMA CITY BRICKTOWN                 )
DEVELOPMENT, LLC; JQH – ROGERS          )
CONVENTION CENTER DEVELOPMENT, LLC;     )
JQH – SAN MARCOS DEVELOPMENT, LLC;      )
HAMMONS OF SOUIX FALLS, LLC;            )
HAMMONS OF TULSA, LLC; JQH – LA VISTA   )
CY DEVELOPMENT, LLC; JQH – ALLEN        )
DEVELOPMENT, LLC; and JQH – CONCORD     )
DEVELOPMENT, LLC,                       )
                                        )
        Defendants.                     )
                                        )
_____ )
JACQUELINE A. DOWDY, as Trustee of THE  )
REVOCABLE TRUST OF JOHN Q. HAMMONS,     )
DATED DECEMBER 28, 1989, AS AMENDED     )
AND RESTATED; JACQUELINE A. DOWDY, as   )
the Personal Representative of the JOHN Q. )
HAMMONS ESTATE; GREGGORY D. GROVES,     )
as Trustee of THE REVOCABLE TRUST OF JOHN )
Q. HAMMONS, DATED DECEMBER 28, 1989,    )
AS AMENDED AND RESTATED; THE            )
REVOCABLE TRUST OF JOHN Q. HAMMONS,     )
DATED DECEMBER 28, 1989, AS AMENDED     )
AND RESTATED; HAMMONS OF NEW            )
MEXICO, LLC; HAMMONS OF FRISCO, LLC;    )
HAMMONS OF COLORADO, LLC; HAMMONS       )
OF ARKANSAS, LLC; HAMMONS OF SOUTH      )
CAROLINA, LLC; CITY CENTRE HOTEL        )
CORPORATION; HAMMONS OF HUNTSVILLE,     )
LLC; HAMMONS OF OKLAHOMA CITY, LLC;     )
HAMMONS OF LINCOLN, LLC; HAMMONS OF     )
FRANKLIN, LLC; HAMMONS OF               )
RICHARDSON, LLC; RICHARDSON             )
HAMMONS, LP; JOHN Q. HAMMONS CENTER,    )
LLC; CHATEAU LAKE, LLC; JQH – EAST      )
PEORIA DEVELOPMENT, LLC; JOHN Q.        )
HAMMONS FALL 2006, LLC; JQH – FT. SMITH )
DEVELOPMENT, LLC; JQH – GLENDALE, AZ    )
DEVELOPMENT, LLC; JQH – KANSAS CITY     )
DEVELOPMENT, LLC; JQH – LA VISTA III,   )
DEVELOPMENT, LLC; JQH – LA VISTA        )
CONFERENCE CENTER DEVELOPMENT, LLC;     )
JQH – MURFREESBORO, DEVELOPMENT,        )

LLC; JQH – NORMAN DEVELOPMENT, LLC;     )
JQH – NORMAL DEVELOPMENT, LLC; JQH –     )
OKLAHOMA CITY BRICKTOWN     )
DEVELOPMENT, LLC; JQH – ROGERS     )
CONVENTION CENTER DEVELOPMENT, LLC;     )
JQH – SAN MARCOS DEVELOPMENT, LLC;     )
HAMMONS OF SOUIX FALLS, LLC;     )
HAMMONS OF TULSA, LLC; JQH – LA VISTA     )
CY DEVELOPMENT, LLC; JQH – ALLEN     )
DEVELOPMENT, LLC; JQH – CONCORD     )
DEVELOPMENT, LLC,     )
     )
    Counterclaims Plaintiffs,     )
     )
  v.     )
     )
JD HOLDINGS, L.L.C.,     )
     )
    Counterclaim Defendant,     )
     )
  and     )
     )
ATRIUM HOTELS, LP., and ATRIUM GP, LLC,     )
     )
    Third-Party Defendants.     )


## MEMORANDUM OPINION

Date Submitted:  September 3, 2014
Date Decided:  October 1, 2014

David J. Teklits, Kevin M. Coen, MORRIS, NICHOLS, ARSHT & TUNNEL LLP, Wilmington, Delaware; Scott A. Edelman, Alan J. Stone, Jed M. Schwartz, MILBANK, TWEED, HADLEY & McCLOY LLP, New York, New York; *Attorneys for Plaintiffs JD Holdings, L.L.C., Jonesboro Funding, LLC, and Eastgate Funding, LLC, Counterclaim Defendant JD Holdings, L.L.C., and Third Party Defendants Atrium, Hotels, LP, and Atrium GP, LLC.*

Shannon Larner Brainard, Richard R. Wier, Jr., MARSHALL DENNEHY WARNER COLEMAN & GOGGIN, Wilmington, Delaware; Janene Marasciullo, WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP, New York, New York; *Attorneys for Defendants, Counterclaim Plaintiffs, and Third Party Plaintiffs Jacqueline A. Dowdy and*

*Greggory D. Groves as Trustees of the Revocable Trust of John Q. Hammons, Dated December 28, 1989, As Amended and Restated.*

Blake Rohrbacher, Thomas A. Beck, Susan M. Hannigan, RICHARDS, LAYTON & FINGERS, P.A., Wilmington, Delaware; C. Vincent Maloney, Jonathan R. Buck, Jade D. Lambert, PERKINS COEI LLP, Chicago, Illinois; *Attorneys for All Defendants, Counterclaim Plaintiffs, and Third Party Plaintiffs Other Than Jacqueline A. Dowdy and Greggory D. Groves as Trustees of the Revocable Trust of John Q. Hammons, Dated December 28, 1989, As Amended and Restated.*

**LASTER, Vice Chancellor.**

In 2005, hotel-entrepreneur John Q. Hammons entered into a complex transaction involving a public company he controlled, various private entities that he also controlled, and a third party investor (the "2005 Transaction"). In the 2005 Transaction, the public stockholders received cash and Hammons received assorted consideration that included a short-term loan of $25 million, a long-term loan of $275 million, and a preferred equity interest in the privately held post-transaction entity. This structure allowed Hammons to exit from the public markets, obtain a degree of liquidity, and avoid a deemed sale that would trigger capital gains taxes.

Hammons's counterparties in the 2005 Transaction were entities affiliated with Jonathan Eilian. Eilian emerged with operational control of the post-transaction entity and ownership of all of its common equity. Eilian and Hammons also entered into an agreement that gave Eilian a right of first refusal and various other rights regarding hotels that Hammons had developed and owned through separate entities that were not part of the 2005 Transaction, or which the parties anticipated that Hammons would develop and own outside of the post-transaction entity after the 2005 Transaction closed (the "ROFR Agreement" or "RA").

The plaintiffs in this action are entities affiliated with Eilian. The defendants are predominantly entities that were affiliated with Hammons. The plaintiffs originally filed suit to resolve certain disputes over the ROFR Agreement. During the pendency of the case, Hammons passed away. The ROFR Agreement addresses the parties' obligations upon Hammons's death, but the parties could not agree on its requirements. The plaintiffs then amended their complaint to seek a determination that the ROFR

1

Agreement imposes an affirmative obligation on Hammons's estate, a trust Hammons created, and the entities Hammons controlled to sell the hotels covered by the ROFR Agreement for cash within two years of Hammons death, subject to Eilian's right of first refusal. The defendants contend that the ROFR Agreement does not create any affirmative obligation to sell and, if it did, would be void under the rule against perpetuities. These are the principal claims; the parties have raised other issues and arguments.

The parties have cross-moved for judgment on the pleadings as to certain counts of the complaint and counterclaims. As to Count X of the Complaint, which seeks a declaration that the ROFR Agreement applies to property interests owned by three specific entities, the plaintiffs' motion for judgment on the pleadings is denied. As to the other counts at issue, judgment is granted in favor of the plaintiffs and against the defendants.

## I. FACTUAL BACKGROUND

Because the parties have cross-moved for judgment on the pleadings, the facts are drawn from the operative pleadings and the documents incorporated by reference. When evaluating each movant's motion, the facts are viewed in the light most favorable to the non-movant. The background facts are largely undisputed, although the parties disagree about their implications.

Additional facts are drawn from decisions in prior litigation in this court. After the announcement of the 2005 Transaction, stockholder plaintiffs challenged the deal. They argued that Hammons breached his fiduciary duties as a controlling stockholder by

2

structuring the 2005 Transaction to secure personal benefits for himself, and they contended that Eilian's acquiring entities aided and abetted Hammons's breaches of duty. Hammons was the principal defendant in that case, and Eilian participated actively. The litigation generated a summary judgment opinion, *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613 (Del. Ch. Oct. 2, 2009) [hereinafter the "Summary Judgment Opinion" or "SJ Op."], and a post-trial opinion, *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2011 WL 227634 (Del. Ch. Jan. 14, 2011) [hereinafter the "Post-Trial Opinion" or "PT Op."]. The Summary Judgment Opinion included a thorough discussion of the events leading up to the 2005 Transaction and its terms, and the Post-Trial Opinion incorporated that discussion by reference and adopted its contents as post-trial findings of fact. *See id.* at *2 ("I will not repeat the extensive (and identical) factual background of the case, which has been thoroughly documented in [the Summary Judgment Opinion.] All of the factual details recited in my earlier opinion are fully adopted here.") (footnote omitted). This decision relies on the findings of fact made in the Post-Trial Opinion, although it cites to the Summary Judgment Opinion for the details of those findings.

A.    **Hammons And His Hotel Companies**

In 1994, Hammons formed a Delaware corporation called John Q. Hammons Hotels, Inc. Because shares issued by this entity traded publicly, this decision refers to it as the "Public Hotel Company." It had two classes of common stock: Class A shares with one vote per share, and Class B shares with fifty votes per share. The Class A shares were issued to the public. The Class B shares were privately held. Through a

3

revocable trust created by Hammons under a trust agreement dated December 28, 1989 (the "JQH Trust"), Hammons owned approximately 5% of the Class A shares and all of the Class B shares. These combined holdings gave Hammons control over nearly 76% of the Public Hotel Company's outstanding voting power. Hammons served as Chairman and CEO of the Public Hotel Company.

The Public Hotel Company used the proceeds of its initial public offering to purchase a 28% general partner interest in a privately held Delaware limited partnership called John Q. Hammons Hotels, LP (the "Hotel Limited Partnership"). Through the JHQ Trust, Hammons owned the remaining 72% of the Hotel Limited Partnership's equity as its sole limited partner. Through his control over the Public Hotel Company, Hammons controlled the Hotel Limited Partnership. The Hotel Limited Partnership in turn owned various entities that either owned or managed hotels.

## B. The Public Hotel Company Obtains A Right of First Refusal

Hammons's passion was developing hotels. He appears to have been less attuned to the corporate governance consequences of taking other people's money through an initial public offering. The board of directors of the Public Hotel Company (the "Board") believed (correctly) that it, and not Hammons, had the authority to manage the business and affairs of the Public Hotel Company. Hammons and the Board disagreed over matters such as the pace at which Hammons wanted to develop new hotels, the Board's use of stock options to compensate employees, Hammons's hiring of a senior executive without Board approval, and the sale of hotels that the Board (but not Hammons) no longer regarded as core assets. *See* SJ Op., 2009 WL 3165613, at *3-4.

The disagreement over the pace of hotel development progressed to a point where the Board imposed a moratorium on Hammons's development of new hotels. To resolve the impasse, Hammons and the Board negotiated an agreement that allowed Hammons "to use [Public Hotel] Company resources for his private [hotel] development activities, in exchange for giving the [Public Hotel] Company the opportunity to manage such hotels and acquire them if they were offered for sale." *Id.* at *3.

**C.      Hammons Explores Alternatives For The Public Hotel Company.**

"In early 2004, Hammons informed the Board that he had begun discussions with third parties regarding a potential sale of [the Public Hotel Company] or his interest in [it]." *Id.* at *4. Hammons hoped to achieve a transaction that would cash out the Class A stockholders and provide him with a degree of liquidity that could be used (among other things) to develop new hotels. He did not want to incur massive capital gains taxes. To achieve his tax goal, Hammons had to retain an interest in the surviving entity "and continue to have capital at risk." *Id.*

On October 15, 2004, Barceló Crestline Corporation ("Barceló") informed the Board that it had entered into an agreement with Hammons and would be offering $13 per share for all of the outstanding shares of the Public Hotel Company's Class A stock. The deal provided Hammons with a $250 million line of credit. To ensure favorable tax treatment, Hammons's interests in the Public Hotel Company and the Hotel Limited Partnership would be converted into a new class of preferred limited partner interests in the Hotel Limited Partnership that carried a large liquidation preference. Hammons also

5

would receive the Chateau on the Lake Resort, one of the Public Hotel Company's premier properties.

"Recognizing that Hammons's interests in the transaction may not have been identical to those of the unaffiliated [Public Hotel Company] stockholders, the Board formed a special committee to evaluate and negotiate [the] proposed transaction." *Id.* After Barceló announced its transaction publicly, Eilian contacted the special committee and expressed interest in an alternative transaction. The Board later expanded the special committee's mandate to include responding to requests from interested parties. At least two other parties contacted the special committee. *Id.* at 6.

During the ensuing process, Eilian eventually offered to acquire all outstanding shares of Class A common stock for $24 per share. With the special committee's permission, Eilian then negotiated and reached an agreement with Hammons on other terms for the transaction. The result was the 2005 Transaction. The Board approved it on June 14, 2005. The Public Hotel Company stockholders approved it on September 15, 2005. The deal closed on September 16, 2005.

## D. The Terms Of The 2005 Transaction

The 2005 Transaction was complex and had multiple parts. The framework for the 2005 Transaction was set forth in a Second Amended and Restated Transaction Agreement dated as of September 16, 2005 (the "Transaction Agreement" or "TA"). At bottom, the 2005 Transaction was designed to cash-out the public stockholders and provide Hammons with liquidity "without triggering the tax liability associated with an equity or asset sale." SJ Op., 2009 WL 3165613, at *7.

6

Eilian participated in the transaction through plaintiff JD Holdings, L.L.C., which the transaction documents refer to as "JDH" or the "Sponsor." At the public company level, the Public Hotel Company merged with an acquisition subsidiary of JD Holdings and emerged as an indirect, wholly owned subsidiary of JD Holdings. Through the merger, each share of Class A common stock was converted into the right to receive $24 per share in cash. Through the JHQ Trust, Hammons received the merger consideration for the 5% of the Class A shares that he owned, and he also received the cash value of his options. *See* TA § 2.1(b).

The Summary Judgment Opinion summarizes the other steps in the 2005 Transaction:

> Although each Class B share initially remained a share of common stock of the surviving corporation, those shares were eventually converted into a preferred interest in the surviving limited partnership . . . . In order to achieve his tax goals, Hammons had to have an ownership interest in the surviving LP and continue to have capital at risk. Accordingly, Hammons was allocated a 2% interest in the cash flow distributions and preferred equity of the surviving LP. Atrium GP, LLC, an Eilian company, became general partner of the surviving LP and received a 98% ownership interest. Hammons's preexisting limited partner interest in [the Hotel Limited Partnership] was converted into a capital account associated with his preferred interest in the surviving LP, which had a liquidation preference of $328 million. When combined with the preferred interest from the conversion of his Class B shares, Hammons's capital account totaled a liquidation preference of $335 million. The partnership agreement provided for events in which the capital account could be distributed during Hammons's lifetime, but because of certain tax consequences, it was anticipated that distribution of the capital account was to occur at Hammons's death.

SJ Op., 2009 WL 3165613, at *7. The obvious reason for keying a distribution or other taxable event off Hammons's death was the step-up in basis that Hammons's heirs would

7

receive under the Internal Revenue Code. *See* 26 U.S.C. § 1014. Not coincidentally, Hammons received a right of indemnification from the surviving LP for any tax liability incurred from the sale of any of its hotels during his lifetime. SJ Op., 2009 WL 3165613, at *8.

The agreements governing the 2005 Transaction established other rights and obligations. "Importantly, Hammons received a $25 million short-term line of credit and a $275 million long-term line of credit." *Id.* Eilian subsidized this financing package, which would not have been available on the open market. *Id.* at *13. The loan package provided Hammons with liquidity and enabled him to continue doing what he loved—developing hotels.

Hammons and Eilian agreed to reciprocal "restrictions on the development of new hotels that would compete with existing hotels owned by either party." *Id.* at *8. Eilian agreed to continue using Hammons's management company to manage the hotels owned by the Hotel Limited Partnership in return for paying the management company's operating expenses and reimbursing it for Hammons's salary and benefits. *Id.* Hammons also received a distribution of the Chateau on the Lake Resort. *See* TA § 2.1(d).

Just as the Public Hotel Company had received a right of first refusal when the Board agreed to permit Hammons to use Public Hotel Company resources to develop his own hotels, Eilian bargained for and obtained the rights provided by the ROFR Agreement as part of the 2005 Transaction. For his part, Hammons secured a right of first refusal to acquire any hotels that Eilian caused the Hotel Limited Partnership to sell. TA § 2.1(k)(iii).

8

Generally speaking, the ROFR Agreement required Hammons to provide JD Holdings with notice of any third party offer to purchase a JQH Subject Hotel, defined in the ROFR Agreement as any interest in real or personal property "used in the operation of a hotel facility, or any interest in any related convention or entertainment facility, retail facility, parking facility or gaming facility" owned by Hammons or an entity he controlled. RA § 1.1. The ROFR Agreement gave JD Holdings thirty days after receipt of the notice to elect to purchase the property. RA § 2.1(a). If JD Holdings opted to purchase the property, then the parties would be required to "close such sale transaction on substantially identical economic terms," except that JD Holdings would not be required to pay certain fees, such as broker fees, mortgage transfer fees, and franchise transfer fees, and Hammons would be required to provide JD Holdings with subordinate seller financing equal to 22.5% of the purchase price. *Id.* § 2.1(b). If JD Holdings declined to purchase the property or did not make an election within thirty days, then Hammons would be free to proceed with the sale. *Id.* § 2.1(a).

Contrary to the defendants' current position that the ROFR Agreement is invalid, Hammons represented in the Transaction Agreement that he and his entities had "all requisite power and authority to execute and deliver this Agreement . . . and all other agreements and documents to be executed or delivered by such party . . . and to perform its or his obligations hereunder and thereunder." TA § 4.1. Hammons and his entities further represented that each of the Transaction Agreement and all other agreements constituted "a valid and binding obligation" and was "enforceable . . . in accordance with its terms." *Id.* These representations covered the ROFR Agreement. In the proxy

9

statement issued in connection with the 2005 Transaction, Hammons and his associates disclosed the existence of the ROFR Agreement and described the rights that it granted to JD Holdings without providing any disclosures regarding its purported invalidity.

After the 2005 Transaction, Eilian's entity, JD Holdings, indirectly owned 100% of the equity of what had been the Public Hotel Company. The Hotel Limited Partnership survived the transaction and was renamed Atrium Hotels, L.P. Through Atrium GP, LLC, the successor to the Public Hotel Company in its capacity as the general partner of the Hotel Limited Partnership, JD Holdings owned 100% of the Hotel Limited Partnership's general partner interest. JD Holdings also indirectly owned the Hotel Limited Partnership's non-preferred limited partner interest.

The JQH Trust emerged from the 2005 Transaction owning the preferred limited partner interest in the Hotel Limited Partnership. The partnership agreement governing the Hotel Limited Partnership (the "Partnership Agreement" or "PA") refers to the preferred limited partner interest as the "Preferred Equity Units." The Preferred Equity Units had a liquidation preference of $335 million, but Hammons's receipt of this amount was not guaranteed. Nor could it be. To achieve his tax goals, Hammons had to continue to have "capital at risk." SJ Op., 2009 WL 3165613, at *7.

E.      **Disputes Arise.**

After the 2005 Transaction, the Hotel Limited Partnership continued to own approximately forty-three hotels and to manage approximately fifteen others. Hammons continued to own the hotels that he had owned outside of the Hotel Limited Partnership before the transaction, and he continued to develop new hotels outside of the Hotel

10

Limited Partnership. The defendants indicate that there are now more than thirty hotels and other properties that Hammons owned or developed outside of the Hotel Limited Partnership.

During this period, Hammons acted as if the ROFR Agreement was valid and in effect, including by providing JD Holdings with executed, notarized memoranda confirming the rights JD Holdings held under the ROFR Agreement for particular properties. Nevertheless, disputes arose about the extent of the obligations imposed by the ROFR Agreement, including the degree to which the ROFR Agreement governed the other hotels that Hammons was developing. In December 2008, JD Holdings and Hammons addressed some of these disputes through an amendment to the ROFR Agreement (the "ROFR Amendment"). Contrary to the defendants' current position regarding the invalidity of the ROFR Agreement, Hammons acknowledged that "[e]xcept as modified hereby, the ROFR remains unmodified and in full force and effect." ROFR Amendment ¶ 6.

After the execution of the ROFR Amendment, Hammons continued acting as if the ROFR Agreement was valid and in effect, including by providing JD Holdings with additional executed, notarized memoranda confirming the rights JD Holdings held under the ROFR Agreement for particular properties. Hammons also sought and obtained waivers from JD Holdings of its rights under the ROFR Agreement for certain properties. In 2012, Hammons complied with the ROFR Agreement and notified JD Holdings of an offer to purchase a hotel on Eastgate Boulevard in Cincinnati, Ohio. JD Holdings exercised its right of first refusal and purchased the property.

As to other aspects of the ROFR Agreement, however, the parties differed. In May 2012, Eilian caused JD Holdings to sue Hammons, the JHQ Trust, the trustees of the JHQ Trust, and the various entities through which Hammons and the JHQ Trust owned other hotels to obtain a declaration regarding the meaning of the ROFR Agreement.

On May 26, 2013, Hammons died. The parties disagreed about what obligations arose under the ROFR Agreement upon Hammons's death, but they agreed that it triggered a ninety-day period during which Eilian would negotiate exclusively with the JQH Trust and Hammons's estate to determine whether Eilan would buy the other hotels. During these negotiations, Eilian insisted that even if the parties did not agree on a transaction during their exclusive negotiation period, the JQH Trust was obligated under the ROFR Agreement to sell all of the other hotels for cash. The JQH Trust rejected this interpretation of the ROFR Agreement.

On January 16, 2014, JD Holdings filed an amended complaint that raised new claims under the ROFR Agreement in light of Hammons's death. *See* Dkt. 27 (the "Complaint" or "Compl."). The defendants answered and asserted counterclaims and third party claims. *See* Dkt. 32 (the "Counterclaims"). In the Counterclaims, the defendants asserted for the first time that the ROFR Agreement was invalid as a violation of the rule against perpetuities and an unreasonable restraint on alienation.

The parties have cross-moved for judgment on the pleadings. The counts of the Complaint at issue on the cross-motions are:

- Count I, which seeks a declaratory judgment that the rule against perpetuities does not apply to the ROFR Agreement.

12

- Count II, which seeks a declaratory judgment as to the meaning of Section 3.2 of the ROFR Agreement.

- Count III, which seeks a declaratory judgment that the ROFR Agreement is not an unreasonable restraint on the alienation of property.

- Count X, which seeks a declaratory judgment as to the assets included within the definition of JQH Subject Hotels in the ROFR Agreement.

The counts of the Counterclaims at issue on the cross-motions are:

- Count I, which seeks a declaratory judgment that Section 3.2 of the ROFR Agreement is unenforceable because it lacks specific terms.

- Count II, which seeks a declaratory judgment that the ROFR Agreement is unenforceable because it violates the rule against perpetuities.

- Count III, which seeks a declaratory judgment that the ROFR Agreement is unenforceable because it operates as an unreasonable restraint on alienation of property.

- Count IV, which seeks a declaratory judgment that Section 3.2 of the ROFR Agreement requires the JQH entities to complete the sale of the JQH Subject Hotels only after the Hotel Limited Partnership fully redeems the Preferred Equity Units.

- Count VI, which seeks to equitably estop the plaintiffs from making certain arguments.

## II.    LEGAL ANALYSIS

After the closing of the pleadings, but within such time as not to delay trial, a party may move for judgment on the pleadings.  Ct. Ch. R. 12(c).  "In determining a motion under Court of Chancery Rule 12(c) for judgment on the pleadings, a trial court is required to view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party." *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993) (footnote omitted). "The court must take the well-pleaded facts alleged in the complaint as admitted." *Id.*

13

"A motion for judgment on the pleadings may be granted only when no material issue of fact exists and the movant is entitled to judgment as a matter of law." *Id.*

The three plaintiffs in this dispute are entities affiliated with Eilian, so this opinion speaks in terms of positions taken by Eilian, unless the context demands specifying a particular entity. This shorthand is used only for convenience and does not imply that this decision is somehow disregarding the entities actually involved. A similar convention is used for the defendants, which comprise the JHQ Trust, its two human trustees, Hammons's estate, and a host of entities through which Hammons beneficially owned hotels. The current record does not shed much light on whether Hammons owned the various hotel companies through the JHQ Trust or whether he owned them directly, such that they passed to his estate. The record similarly does not provide insight into whether Hammons's estate plan caused the hotel entities to flow into in the JHQ Trust. There are, of course, myriad other possibilities. It does appear from the current record and the prior litigation challenging the 2005 Transaction that Hammons intended for the JHQ Trust to be his principal ownership vehicle. This opinion therefore refers to the defendants' positions as taken by the JHQ Trust, unless the context demands a different referent. As with Eilian, this shorthand does not imply that this decision is disregarding the differences among the relevant entities.

## A.    The Meaning Of Section 3.2 of the ROFR Agreement

The different counts in the pleadings and the parties' various arguments revolve around the meaning of Section 3.2 of the ROFR Agreement. It is therefore helpful to begin with Count II of the Complaint, in which Eilian seeks a declaratory judgment as to

the meaning of Section 3.2. This count corresponds to Count I of the Counterclaims, in which the JHQ Trust seeks a declaratory judgment that Section 3.2 is unenforceable because it lacks specific terms. This section also addresses Count IV of the Counterclaims, which seeks a declaratory judgment that Section 3.2 of the ROFR Agreement requires the JQH Trust to complete the sale of the JQH Subject Hotels only after the Hotel Limited Partnership fully redeems the Preferred Equity Units.

### 1.    Principles Of Contract Interpretation

The ROFR Agreement is a contract governed by Delaware law. *See* RA § 3.6. When interpreting such a contract, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012). "Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Trust v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993). "Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning." *Alta Berkeley*, 41 A.3d at 385 (footnotes omitted).

15

"In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). "Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *Id.* "It is well established that a court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument." *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

### 2. Count II of the Complaint: The Plain Meaning Of Section 3.2

As is common in contractual disputes, both sides contend that the meaning of Section 3.2 is plain, but each espouses a different plain meaning. Having considered the language of Section 3.2 within the ROFR Agreement as a whole, I believe that Eilian has captured the plain meaning of the provision. Judgment is therefore granted in the plaintiffs' favor on Count II of the Complaint.

Section 3.2 states:

> JQH, each applicable JQH Entity and the JQH Trust agree that, upon the death of JQH, the JQH Trust and each applicable JQH Entity will Sell for cash or cause the Sale for cash of all of the JQH Subject Hotels to be completed no later than the later to occur of (a) two (2) years after the date of JQH's demise, and (b) full redemption or other permitted disposition by JQH and his Affiliates of all of his and their [Preferred Equity Units]. Subject to the provisions of Section 3.16 herein, each of [JD Holdings] and the JQH Trust and other applicable JQH Entity agrees, for a period expiring 90 days after the date of JQH's demise, to negotiate exclusively and in good faith with each other to Sell the JQH Subject Hotels to [JD Holdings] or an Affiliate thereof for prices and upon terms mutually acceptable to the

16

JQH Trust or other applicable JQH Entity and to [JD Holdings]. Any other Sale of a JQH Subject Hotel shall be subject to the provisions of this Agreement.

ROFR Agreement § 3.2.

The three sentences of Section 3.2 work together to create a framework for selling the JQH Subject Hotels within a defined period of time after Hammons's death. The first sentence imposes an obligation on the JQH Trust to sell "all" of the JQH Subject Hotels. *Id.* The obligation is mandatory ("will Sell") and is triggered by Hammons's death ("upon the death of JQH"). The provision requires that the JQH Subject Hotels be sold "for cash." *Id.* Otherwise, the provision does not seek to impose particular terms on the JQH Trust. The JQH Trust can sell for as much or as little as it wants, and it can take whatever steps it wants to comply with its contractual obligation to sell "all" of the JQH Subject Hotels "for cash."

The first sentence of Section 3.2 also imposes a deadline. All of the JQH Subject Hotels must be sold by an outside date: "no later than *the later to occur of* (a) two (2) years after the date of JQH's demise, and (b) full redemption or other permitted disposition by JQH and his Affiliates of all of his and their [Preferred Equity Units]." *Id.* (emphasis added). By framing the deadline as the "later to occur of" these two events, Section 3.2 gives the JQH Trust at least two years after Hammons's death to sell "all" of the JQH Subject Hotels. The deadline could be extended if "a full redemption or other permitted disposition" is not accomplished until after the two year mark, giving the JQH Trust more time to sell the JQH Subject Hotels. If all of the JHQ Subject Hotels are not sold by the outside date, then the JQH Trust will find itself in breach of Section 3.2.

17

The second sentence of Section 3.2 speaks to what happens during a subset of the minimum two year sale period, defined as the first ninety days after Hammons's death. During that ninety-day period, Eilian and the JQH Trust have an obligation "to negotiate exclusively and in good faith with each other to Sell the JQH Subject Hotels" to Eilian. *Id.* The first two sentences of Section 3.2 thus divide the minimum two-year sale period into two phases. During the first phase, which lasts ninety days, Eilian has an exclusive negotiation right. During the second phase, which comprises the balance of the sale period, the JQH Trust is not required to negotiate exclusively with Eilian and can explore a sale with anyone it wants.

The third sentence of the ROFR Agreement protects Eilian's rights during the second phase of the sale period, after exclusivity has lapsed, when the JQH Trust can explore a sale with anyone it wants. The third sentence states "[a]ny other Sale of a JQH Subject Hotel shall be subject to the provisions of this Agreement." *Id.* Coming directly on the heels of the sentence describing the exclusive negotiation period, this sentence makes plain that if Eilian and the JQH Trust do not reach agreement on a sale during the exclusivity period, "[a]ny other Sale" is subject to the terms of the ROFR Agreement, which gives Eilian a right of first refusal. The JQH Trust can comply with its obligation to sell "all" of the JQH Subject Hotels by reaching an agreement with anyone it wants on whatever terms it wants (so long as the sale is for cash), subject to Eilian's ability to exercise the right of first refusal and other rights set forth in "this Agreement."

The plain meaning of Section 3.2 thus imposes on the JQH Trust a current and on-going obligation to sell all of the JQH Subject Hotels for cash. Because the initial ninety-

18

day exclusive negotiation period that followed Hammons's death passed without a deal being reached, the JQH Trust can sell to anyone on any terms it wishes, as long as it sells for cash. If the JQH Trust reaches agreement on the terms of a sale with a buyer other than Eilian, then Eilian has a right of first refusal to acquire the property on the agreed-upon terms. The JQH Trust will find itself in breach of the ROFR Agreement if it does not complete the process of selling all of the JQH Subject Hotels by the later of (i) May 26, 2015, which is two years after Hammons's death, or (ii) a full redemption or other permitted disposition by Hammons or his affiliates of all of his Preferred Equity Units.

Judgment is therefore granted in favor of the plaintiffs and against the defendants on Count II of the Complaint as to the meaning of Section 3.2 of the ROFR Agreement. Judgment is likewise granted in favor of the plaintiffs and against the defendants on Count IV of the Counterclaims.

### 3. Count I of the Counterclaims: The ROFR Agreement Does Not Fail For Lack Of Specific Terms

In response to the foregoing interpretation of Section 3.2, the JQH Trust advances its own interpretation in which the provision cannot impose any obligation to sell because it lacks definitive terms. The provision is therefore at most only an agreement to agree. In support of its reading, the JQH Trust contends that it would be implausible for Hammons to agree to sell the hotel business he loved. Count I of the Counterclaims seeks a declaratory judgment establishing these points. In light of the plain meaning and operation of Section 3.2, judgment is entered against the defendants and in favor of the plaintiffs on Count I of the Counterclaims.

19

The JQH Trust argues strenuously that Hammons would never have agreed to sell his hotel business, making it inconceivable that the language of Section 3.2 should be read to compel that result. But the idea that Hammons would agree to sell in the manner he did is not only conceivable, but consistent with his goals at the time of the 2005 Transaction (as found by the Post-Trial Opinion), and it fits with the overall structure of the 2005 Transaction and the terms of the ROFR Agreement. For Hammons to obtain liquidity in 2005 primarily through loans secured by the Preferred Equity Units and thereby defer any actual or deemed sales until after his death made eminent sense, because his heirs could benefit from a step-up in basis. The deferral of the sales until after his death also meant that Hammons could continue managing and developing hotels for the balance of his life. The JQH Trust has not identified anything in the ROFR Agreement or the 2005 Transaction that suggests Hammons was attempting to pass on his business, intact, to his heirs, or to secure for them the opportunity for self-actualization that Hammons found in managing and developing hotels.

Taking a different stab at the inconceivability argument, the JQH Trust argues that the Hotel Limited Partnership is now heavily indebted such that it is unlikely that the JQH Trust will receive the full value of its $335 million liquidation preference. The JQH Trust suggests that if the plain meaning of Section 3.2 is enforced, the Hotel Limited Partnership dissolved, and the JHQ Trust is forced to divest its hotels, then Hammons would have sold his hotel business in 2005 for virtually nothing. That is facially wrong. Hammons received the $24 per share merger consideration for the 5% of the Class A shares held by the JHQ Trust as well as the cash value of his options. More importantly,

20

Hammons received $300 million in loan proceeds. Hammons effectively achieved a meaningful degree of liquidity through 2005 Transaction, but because of his tax needs, the bulk of it was provided through loans rather than an outright sale. Hammons's capital account in the Hotel Limited Partnership was valued initially at $328 million, so he had the potential for additional value when his Preferred Equity Units were liquidated or redeemed, as well as upside if the Hotel Limited Partnership increased in value. Hammons also secured a trophy property—the Chateau on the Lake Resort—and the right to continue managing the Hotel Limited Partnership's hotels. Nor is the JQH Trust currently being forced to give away the other hotels. The JQH Trust can sell the hotels to the highest bidder or combination of bidders. It is true that Eilian can exercise his right of first refusal, match the terms, and buy the property, but the JQH Trust gets the cash regardless. Far from representing an inconceivable business deal, the structure and terms of the 2005 Transaction has the hallmarks of the type of smart, forward-looking deal that a successful businessman like Hammons would structure.

Based on its theory that Hammons would never have agreed to exit the hotel business, the JQH Trust reads Section 3.2 wishfully as an agreement to agree. According to the JQH Trust, the first sentence of Section 3.2 does not impose any obligation on the JQH Trust to sell the JQH Subject Hotels. Rather, the JQH Trust claims that the language requiring that a sale "be completed no later than the later to occur of (a) two (2) years after the date of JQH's demise, and (b) full redemption or other permitted disposition by JQH and his Affiliates of" their Preferred Equity Units is actually the trigger for any obligation to sell. *See* Dkt. 49 ("DOB") at 9 (contending that Section 3.2

21

"establishes two conditions precedent to Defendants' sale of the JQH Subject Hotels"); *id.* at 17-23 (same). This reading is flatly contrary to the first sentence of Section 3.2, which states that "upon the death of JQH," the JQH Trust "will Sell for cash or cause the Sale for cash of all of the JQH Subject Hotels." The obligation to sell arises on Hammons's death. The sale process must be completed by the deadline. If the deadline arrives and the JQH Trust has not taken any steps to effectuate a sale, then the JHQ Trust will find itself in breach.

The JQH Trust also tries to turn the simplicity of the sale obligation into contractual defect, arguing that Section 3.2 "contains no specific terms or guidelines for the sale of the JQH Subject Hotels." Counterclaims ¶ 31; *accord id.* ¶ 33; *see also* DOB at 9, 14-16. In reality, Section 3.2 does contain specific terms. It requires that "all" of the JQH Subject Hotels be sold. It requires that all sales be "for cash." It imposes a deadline for the completion of the sale process. And it establishes an initial ninety-day exclusivity period for Eilian. Otherwise, the JQH Trust is free to sell the JQH Subject Hotels for as much or as little as it wishes, on whatever terms it wishes. The JQH Trust has the contractual flexibility to maximize the value it will receive from the JQH Subject Hotels, either from a third party buyer or from Eilian.

In lieu of accepting that the ROFR Agreement grants contractual freedom to the JQH Trust to act in its own self-interest to maximize the value it will receive, the JQH Trust argues that sale obligation fails for lack of material terms, such as the price. In support of this argument, the JQH Trust cites cases which hold that an agreement to buy or sell is not enforceable as between the parties unless it contains the material terms for

22

the transaction.[1]  Absent material terms, Delaware courts interpret such a right as an agreement to agree.  The JQH Trust argues that these cases doom the sale obligation.

Section 3.2 is not a call option in favor of Eilian.  It does not require the JQH Trust to sell the JQH Subject Hotels to him.  If it did, then the cases that the JQH Trust cites might apply.  Instead, Section 3.2 requires that the JQH Trust sell the JQH Subject Hotels.  It did create an initial ninety-day exclusivity period, but after that, the JQH Trust could (and now can) sell the hotels to anyone, on any terms, as long as the sale is for cash.  If the JQH Trust reaches agreement on terms with a third-party buyer, then the necessity for definitive terms will have been satisfied.  At that point, Eilian can choose whether to exercise his right of first refusal and purchase the hotel *on those terms*.  The parties have already proceeded in this fashion on at least one occasion.  The JQH Trust's effort to analogize Section 3.2 to an indefinite call option or other right to purchase fails to account for how Section 3.2 operates.

The JQH Trust has not advanced a reasonable interpretation of the ROFR Agreement.  Declaratory judgment is granted in favor of the plaintiffs and against the defendants on Count I of the Counterclaims.

---

[1] *See Heritage Homes of De La Warr, Inc. v. Alexander*, 2005 WL 2173992, at \*3 (Del. Ch. Sept. 1, 2005) ("It is a well-settled principle of Delaware law that an agreement to agree in the future without any reasonably objective controlling standards is unenforceable.") (internal quotation marks omitted); *Liquor Exch., Inc. v. Tsaganos*, 2004 WL 5383907 (Del. Ch. Nov. 16, 2004) (holding that provision giving tenant first opportunity to rent space "provided the Landlord and Tenant agree upon all terms" was an agreement to agree).

**B. Count I of the Complaint and Count II of the Counterclaims: The Rule Against Perpetuities**

The parties next join issue over whether Section 3.2 of the ROFR Agreement violates the rule against perpetuities. Count I of the Complaint seeks a declaration that it does not. Count II of the Counterclaims seeks a declaration that it does. In light of the plain meaning of the provision, it does not.

**1. The Substance Of The Rule Against Perpetuities**

Under the common law rule against perpetuities, an interest in property is good if "it vests, if at all, not later than twenty-one years after some life in being at the creation of the interest." *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1383 (Del. 1991). A future interest must vest within the limitations period and "[i]f there is any possibility that the interest will vest beyond the period of the rule, then it is void *ab initio*." *Id.* Delaware law calls on courts to interpret contract provisions to avoid violating the rule against perpetuities. *Id.* at 1384. "If the construction of a grant or of a contract is doubtful, and one construction of the language would result in an interest that would not offend the Rule, that construction should be adopted." *McInerney v. Slights*, 1988 WL 34528, at *5 (Del. Ch. Apr. 13, 1988) (Allen, C.); *accord Smith v. Smith ex rel. Clarke*, 747 A.2d 85, 90 (Del. Ch. 1999) ("Common law has established the principle that where language creating a future interest is susceptible to two interpretations, one in compliance and one in violation of the rule against perpetuities, the former shall be chosen."). Under Delaware law, the rule against perpetuities "applies equally to rights of first refusal, also

24

known as preemptive rights, to acquire interests in land." *Stuart Kingston.*, 596 A.2d at 1384.

Delaware law applies the rule against perpetuities differently to commercial transactions. *Pathmark Stores, Inc. v. 3821 Assocs., L.P.,* 663 A.2d 1189, 1193 (Del. Ch. 1995). In lieu of strictly tying the perpetuities period to a life in being plus twenty-one years, "Delaware courts allow parties to a commercial real estate transaction to negotiate a mutually acceptable time period within which rights under the agreement must be exercised." *Cornell Glasgow, LLC v. LaGrange Props., LLC*, 2012 WL 3157124, at *3 (Del. Super. Aug. 1, 2012).

### 2.    Section 3.2 Does Not Violate the Rule Against Perpetuities

Section 3.2 sets an outside date for the sale of the JQH Subject Hotels, "no later than the later to occur of (a) two (2) years after the date of JQH's demise, and (b) full redemption or other permitted disposition by JQH and his Affiliates of" the Preferred Equity Units. RA § 3.2. The ROFR Agreement is a commercial transaction, and this provision establishes a reasonable time in which the ROFR Agreement will be exercised or expire.

Determining how soon the outside date will arrive depends on when a "full redemption or other permitted disposition" will occur. JD Holdings contends that the term "other permitted disposition" includes the liquidation of the Hotel Limited Partnership. Extensive case law supports the position that a liquidation constitutes a

25

permitted disposition.[2]  Indeed, the JQH Trust does not dispute this point.  Rather, the

JQH Trust argues that the disposition must be "by [Hammons] or his Affiliates,"

requiring a voluntary act on their part.  Courts have consistently rejected this

interpretation and have held that the preposition "by" does not require a voluntary act by

the transferor.[3]  More importantly, Article 11 of the Partnership Agreement, which

describes the few permitted transfers that Hammons could make, demonstrates that the

parties viewed an involuntary transfer as a disposition.  Under Section 11.3(e), if the

lender who funded Hammons's $275 million loan executed on the Preferred Equity Units

as a remedy for default, the transfer would be permitted under the Partnership Agreement

---

[2] *See, e.g., Schumann v. Comm'r*, 857 F.2d 808, 810 (D.C. Cir. 1988) (holding that the liquidation and partial distribution of proceeds to stockholders constituted a "disposition" within the meaning of Section 424 of the Tax Code); *Kast v. Comm'r*, 78 T.C. 1154, 1163 (1982) (same); *accord Spector v. Comm'r*, 641 F.2d 376, 380 (5th Cir. Unit A 1981) (holding that partners may effect a disposition of their interests either through sale or liquidation); *Schiff v. Dir., Div. of Taxation*, 15 N.J. Tax 370, 385-86 (N.J. Tax. Ct. 1995) (holding that dissolution and liquidation of a partnership constituted a disposition); *see also Wilmington Trust Co. v. Tropicana Entm't, LLC*, 2008 WL 555914, at *8 (Del. Ch. Feb. 29, 2008) (defining disposition broadly "to encompass changes in title or ownership").  *See generally* Black's Law Dictionary 539 (9th ed. 2009) (defining "disposition" to include "the relinquishing or property" or any "final settlement or determination").

[3] *See Schumann,* 857 F.2d at 812 ("Schumann's acceptance of the liquidating distributions made pursuant to a duly adopted liquidation plan constitutes a 'disposition ... made *by* him' whether or not he originally voted for adoption of the liquidation plan.") (emphasis added); *In re Pouncey*, 59 B.R. 615, 617 (Bankr. M.D. Ala. 1986) (holding that forced sale by an execution levy constituted a conveyance "by" the owner); *In re Smith*, 45 B.R. 100, 106 (Bankr. E.D. Va. 1984) (treating involuntary garnishment as a transfer "by the debtor"); *Wilmington Trust*, 2008 WL 555914, at *8 (holding that involuntary disposition through appointment of conservator was a disposition "by" the company).

and therefore constitute a permitted disposition by Hammons. PA § 11.3(a). A liquidation similarly falls within the scope of "other permitted disposition" for purposes of determining the outside date, notwithstanding the lack of a voluntary act "by" Hammons's successors.

Section 15.1(b) of the Partnership Agreement provides that if the Preferred Equity Units have not been redeemed before Hammons's death, then the Hotel Limited Partnership must begin liquidating its assets on or before a date that is eighteen months after the "Liquidation Notice Date." That term is defined as the first business day after the earlier to occur of (i) Hammons's death or (ii) October 16, 2018.[4] The liquidation process therefore must begin no later either eighteen months after Hammons's death or April 17, 2020, which is eighteen months after the first business day after October 16, 2018. The liquidation process must be completed within one year after the Liquidation Notice Date or by October 16, 2018, whichever is later. At the time of contracting, the latest that the liquidation process could be completed was the earlier of thirty months after Hammons's death or April 17, 2021. A permitted disposition by Hammons or his affiliates would occur by that date, meaning that the right of first refusal would be exercised or lapse within the earlier of thirty months after the principal seller died or, if the principal seller remained alive, fifteen years and eight months after it was granted.

---

[4] PA, art. I at 13. The Partnership Agreement does not actually specify October 16, 2018. It rather defines the "Calendar Liquidation Notice Date" as "one month after the seventh anniversary of the Effective Date if a Liquidation Notice has been received," with the date being automatically extended for up to six successive one-year periods. PA, art. I at 3. The effective date was September 16, 2005.

For a complex sale of a business involving extensive real estate holdings and deferred tax implications, that is a commercially reasonable period.

In an effort to create uncertainty about the outside date, the JQH Trust cites Section 13.2(b) of the Partnership Agreement, which permits the liquidator "in its Sole and Absolute Discretion [to] defer for a reasonable time the liquidation of any assets" to the extent that an immediate sale would be impractical or would cause undue loss. PA § 13.2. The JHQ Trust claims that this provision would permit indefinite deferrals that would violate the rule against perpetuities. It does not. It only permits reasonable deferrals, and in a commercial transaction, a right will not violate the rule against perpetuities if it will be exercised or lapse within a reasonable time.[5] By definition, Section 13.2 does not permit an unreasonable extension that would violate the rule. Section 13.7 confirms that only that "a reasonable time shall be allowed for the orderly winding-up of the business and affairs of the [Hotel Limited] Partnership and the liquidation of its assets." PA § 13.7.

---

[5] *See Wong v. DiGrazia*, 386 P.2d 817, 825 (Cal. 1963) ("Courts and scholars almost unanimously agree that provisions which make vesting contingent upon performance within a reasonable time, or some equivalent phrase, do not violate the rule [against perpetuities] if, in light of the surrounding circumstances, as a matter of construction, a reasonable time is necessarily less than twenty-one years" (internal quotations omitted)); *Rodin v. Merritt*, 268 S.E.2d 539, 543 (N.C. Ct. App. 1980) (upholding restriction where "[s]urely the conditions contained in the contract between the parties here would be accomplished, if at all, within a reasonable time [and] a reasonable time would not extend beyond 21 years"); *see also Pathmark Stores*, 663 A.2d at 1193 ("Allowing defendants to escape the terms of the contract because Pathmark might exercise the option in an unreasonably remote way defies the contract's terms, logic, common sense, public policy and principles of equity.").

As its final riposte, the JQH Trust reprises its contention that Eilian's interpretation of the ROFR Agreement is inconceivable because Hammons never would have agreed to sell his hotels unless his Preferred Equity Units had been redeemed for no less than $335 million in cash. DOB 18-19. This assertion conflicts with the terms, structure, and purpose of the 2005 Transaction. Hammons received significant benefits from the 2005 Transaction, including cash for his Class A units and options, the Chateau on the Lake property, a continuing right to manage hotels, and $300 million in liquidity through subsidized loans secured by the Preferred Equity Units. Hammons received his consideration in this form and converted his equity into the Preferred Equity Units because he wanted to avoid paying capital gains taxes by deferring any actual or deemed sales until after his death. To achieve that result, Hammons had to have "capital at risk." SJ Op., 2009 WL 3165613, at *7. Put differently, the 2005 Transaction could not guarantee Hammons the redemption of his units for $335 million in cash, as the JQH Trust now argues. Moreover, the multiple provisions in the transaction documents that are keyed off Hammons's death demonstrate that the parties anticipated that, upon Hammons's demise, the complex business structure between Hammons and Eilian could be dismantled through dissolution at Eilian's option, and Hammons's successors would sell off his properties, thereby engaging in sale transactions at a time when his heirs could benefit from a step-up in basis. This result is logical and conceivable. It reinforces, rather than undercuts, the enforceability of the ROFR Agreement.

Read together, the ROFR Agreement and the Partnership Agreement establish a "mutually acceptable time period" in which the right of first refusal would be exercised

29

or lapse. *Cornell Glasgow*, 2012 WL 3157124, at *3; *accord Pathmark*, 663 A.2d at 1193 ("when two commercial entities explicitly create an option for a particular time period, the entities are obviously focusing on the reasonable time period necessary for the commercial development of the property."). Where, as here, "[t]he parties contemplated an end to their relationship," the agreement will not violate the rule against perpetuities. *See Cornell Glasgow*, 2012 WL 3157124, at *4. Judgment is granted in favor of the plaintiffs and against the defendants on Count I of the Complaint and Count II of the Counterclaims.

### C. Count III of the Complaint and Counterclaims: Unreasonable Restraint on Alienation

The next dispute is whether Section 3.2 of the ROFR Agreement constitutes an unreasonable restraint on alienation. Count III of the Complaint seeks a declaration that it does not. Count III of the Counterclaims seeks a declaration that it does. It does not.

The law does not prohibit all restraints on alienation, "only unreasonable restraints are prohibited." *McInerney*, 1988 WL 34528, at *6 (internal quotation marks omitted). Delaware courts use "a fact-intensive approach" to evaluate claims that "a restraint on the alienation of an interest in land is contrary to public policy." *Libeau v. Fox*, 880 A.2d 1049, 1059-1060 (Del. Ch. 2005) (Strine, V.C.). Several factors tend to show that a restraint on property is unreasonable: "(1) the restraint is capricious; (2) the restraint is imposed for spite or malice; (3) the one imposing the restraint has no interest in land that is benefited by enforcement of the restraint; (4) the restraint is unlimited in duration; [and] (5) the number of persons to whom alienation is prohibited is large." *Id.* at 1060

30

(quoting *McInerney*, 1988 WL 34528, at \*7). "If there was a legitimate, non-invidious reason for the restraint in the first instance, the selling party's desire to avoid the restraint is of no moment." *Libeau*, 880 A.2d at 1059.

With one exception, all of the factors point to the reasonableness of Section 3.2. First, it is not capricious. The parties to the 2005 Transaction crafted the ROFR Agreement to provide Eilian with the right to acquire other hotels that Hammons had developed or would develop. The ROFR Agreement gives Eilan the opportunity to acquire Hammons's entire hotel business, but only at a time of Hammons's choosing (if he decides to sell) or within two years after his death (when the JQH Trust must sell). A provision intended to achieve a logical and readily apparent commercial purpose is not capricious.

Second, and for similar reasons, the restraint was not imposed for spite or malice. The parties agreed to it voluntarily as part of a complex, multi-part transaction.

The third factor—whether the party imposing the restraint has an interest in land that is benefited by enforcement of the restraint—is the only factor that does not point clearly in favor of the reasonableness of Section 3.2. Nothing in the record suggests that Eilian has an interest in land that is benefited by the ROFR Agreement, so technically this factor is not satisfied. At the same time, this factor is also not terribly relevant to the current case. While it would have relevance to a local dispute involving a neighborhood or adjoining properties, this case involves the sale of a diverse hotel empire comprising many different hotel properties that was structured to occur in phases over time to achieve the seller's tax goals. Rather than holding property that is benefited by the

31

ROFR Agreement, Eilian owns a business that is benefitted by it. Through the 2005 Transaction, he bargained for the opportunity to own all of Hammons's hotels, first through the acquisition of the Hotel Limited Partnership and later through the exercise of the ROFR Agreement. The business rationale for the ROFR Agreement counsels in favor of its reasonableness, but to be conservative, this decision treats this factor as neutral.

Fourth, as discussed in the previous section, the ROFR Agreement is limited in duration.

Finally, the ROFR Agreement does not exclude a large number of potential buyers. After an initial exclusive negotiation period, the ROFR Agreement permits the JQH Trust to sell a Subject Hotel Property to anyone, subject only to Eilian's right of first refusal.

The ROFR Agreement is not an unreasonable restraint on alienation. Judgment is granted in favor of the plaintiffs and against the defendants on Count III of the Complaint and Count III of the Counterclaims.

## D.    Count VI of the Counterclaims:  Equitable Estoppel

In Count VI of the Counterclaims, the JQH Trust contends that Eilian should be estopped from advancing his current positions about the plain language of the ROFR Agreement. "An estoppel may arise when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment." *Wilson v. Am. Ins. Co.*, 209 A.2d 902, 903-904 (Del. 1965). The Counterclaims do not point to any affirmative act or representation by Eilian on which the JQH Trust relied. Eilian was and is entitled to rely on and now seek to enforce the

32

plain language of the ROFR Agreement. Judgment is entered in favor of the plaintiffs and against the defendants on Count VI of the Counterclaims.

**E.     Count X of the Complaint:  The Scope of the JQH Subject Hotels**

In Count X of the Complaint, Eilian seeks a determination that Section 3.2 of the ROFR Agreement extends to the JQH Trust's interests in Winegardner & Hammons, Inc., W&H Realty, Inc. ("W&H Realty"), and Des Plaines Development L.P. ("Des Plaines"). It is not possible to make such a determination at this stage.

By its plain terms, Section 3.2 of ROFR Agreement requires that the JQH Trust "Sell for cash or cause the Sale for cash of all of the JQH Subject Hotels." RA § 3.2. The ROFR Agreement defines the term "JQH Subject Hotels" as

> those Hotel Properties set forth on <u>Exhibit A</u> hereto, and any Hotel Properties or any direct or indirect interests in Hotel Properties now or hereafter acquired by JQH or any JHQ Entity or any of either of their affiliates, including any properties under construction or being developed or intended to be developed as Hotel Properties. . . .

*Id.* § 1.1. The ROFR Agreement defines the term "Hotel Properties" as

> interests in real property and personal property, tangible or intangible (other than any rights to any tradename using the name "John Q. Hammons" or "Hammons"), used in the operation of a hotel facility, or any interests in any related convention or entertainment facility, retail facility, parking facility or gaming facility, including, without limitation, fee interests, leasehold interests, interests in ground leases, easements and rights of way, air rights, surface rights, subsurface rights, debt or equity interests in corporations, limited liability companies, joint ventures, partnerships or other entities holding title to, or a leasehold interest in, any of the foregoing, interests in mortgages or other security interests in any of the foregoing, contractual management interests, and debt instruments as the Person who holds title to, or a leasehold interest in, such property may hold from time to time (each, a "<u>Hotel Property</u>").

33

*Id.* A JQH Subject Hotel is thus any Hotel Property owned by a JQH Entity. The ROFR Agreement defines "JQH Entity" as those entities that were parties to the ROFR Agreement, including Hammons himself and the JQH Trust, and "any other entity directly or indirectly controlled by [Hammons] which owns a Hotel Property." *Id.* at 1.

As a threshold matter, the JQH Trust argues in response that the JQH Subject Hotels are only those properties listed in Exhibit A of the ROFR Agreement. The JQH Trust also argues that the JQH Subject Hotels are only those Hotel Properties owned by entities listed on Schedule 1 of the ROFR Amendment. Both positions are plainly wrong. The definition of JQH Subject Hotels includes other Hotel Properties or any direct or indirect interests in Hotel Properties that Hammons might own or later acquire. The definition of JQH Subject Hotels also extends to Hotel Properties owned directly or indirectly by Hammons or any JQH Entity.

In a similarly misguided argument, the defendants argue that the ROFR Agreement only extends to Hotel Properties where a JQH Entity owns a majority or controlling interest in the Hotel Property. Whether Hammons or another JQH Entity owns a majority or controlling interest in another entity determines whether or not the entity is a JQH Entity. The concept of control is not relevant to whether or not the property interest owned by the JQH Entity is a Hotel Property and therefore a JQH Subject Hotel. If a JQH Entity owns a Hotel Property, even if the interest is only a minority interest, the Hotel Property is a JQH Subject Hotel and the ROFR Agreement applies.

34

The Complaint alleges that the JQH Trust owns interests in Winegardner & Hammons, which owns interests in two hotels. The Complaint also alleges that the JQH Trust owns interests in W&H Realty, which owns interests in over a dozen hotels. The interests in the hotels are "interests in . . . personal property . . . used in the operation of a hotel facility" and therefore fall within the definition of Hotel Properties, but a Hotel Property is only a JQH Subject Hotel if the Hotel Property is owned by a JQH Entity. For Winegardner & Hammons and W&H Realty to qualify as JQH Entities, they must have been controlled, directly or indirectly, by Hammons. The pleadings are not sufficient for the court to determine whether Winegardner & Hammons and W&H Realty qualify as JQH Entities.

The Complaint alleges that the JQH Trust indirectly owns a 20% interest in Des Plaines, which owns an indirect interest in a Harrah's gaming facility. The ownership interest in the Harrah's gaming facility is an interest "in . . . any gaming facility," bringing it within the definition of Hotel Properties. Once again, however, a Hotel Property is only a Subject Hotel Property if it is owned by a JQH Entity. The pleadings are not sufficient for the court to determine whether Des Plaines is a JQH Entity.

It is not possible to determine at the current procedural stage whether Winegardner & Hammons, W&H Realty, and Des Plaines are JQH Entities such that the interests in hotel and gaming properties owned by those entities are JQH Subject Hotels and subject to the ROFR Agreement. The plaintiffs' motion for judgment on the pleadings is denied as to Count X of the Complaint.

35

## III.    CONCLUSION

The plain language of the ROFR Agreement controls.  Except as to Count X of the Complaint, judgment is granted in favor of the plaintiffs and against the defendants on all of the counts at issue.  Count X requires further factual development before the ROFR Agreement can be applied, so the plaintiffs' motion for judgment on the pleadings is denied.  The parties shall submit an order, agreed as to form, implementing this decision and specifying the disposition of each count.